No. 13,397.

McNUTT *v.* McNUTT ET AL.

ANTENUPTIAL CONTRACT.—*Consideration.*—*Marriage and Release of Marital Rights.*—*Descents.*—Where, in contemplation of marriage, a written antenuptial contract was executed between the prospective husband and his intended wife, reciting such fact, and that both have been married before, have children by such marriage, and have separate estates, and the parties agreeing therein that " the survivor of either shall take and hold no interest, or part of interest, by descent or otherwise, but the estate, both real and personal, shall descend to the heirs the same as it would if they had not married," the marriage and release of all marital rights or interest in the other's property constituted a valuable and sufficient consideration to support the contract, and the survivor (the widow) is barred from claiming any interest by descent or otherwise in the other's estate.

McNutt *v.* McNutt *et al.*

SAME.—*Consideration to Wife.*—In such case it is not necessary that the consideration should equal the dower right of a wife.

SAME.—*Consideration Fixed by Parties.*—In the absence of fraud or mistake, the consideration fixed by the parties to a contract will be deemed sufficient.

SAME.—*Impeachment by Lapse of Time.*—The fact that the promise to marry was made six years before the antenuptial contract was executed will not impeach the consideration of the contract.

SAME.—"*Heir*" *of Husband.*—In such case, the fact that the husband died leaving no lineal descendant will not entitle the wife to any interest in his estate as "heir" or otherwise.

SAME.—*Destroyed Contract.*—*Secondary Evidence.*—Evidence tending to show that an antenuptial contract once existed, and that it was destroyed by a party thereto, is sufficient to let in secondary evidence.

WITNESS.—*Discretion of Court.*—It is within the discretion of the trial court to hear the testimony of a witness although not offered until after the evidence had been closed.

From the Clinton Circuit Court.

*J. C. Suit, S. O. Bayless, W. H. Russell, F. F. Moore* and *R. P. Davidson,* for appellant.

*J. V. Kent, J. W. Merritt, S. H. Doyal* and *P. W. Gard,* for appellees.

ELLIOTT, J.—There is evidence that a written antenuptial contract was executed between the appellant and her husband, Henry G. McNutt, since deceased, and that the writing was destroyed by her.   This is the evidence upon which the trial court acted, and we can not disregard its decision upon this question of fact.   There is also evidence that the contract was in these words :

"Article of agreement this day entered into by and between the said Henry G. McNutt and Eva McBride, both of Clinton county, State of Indiana:

" Whereas, the said Henry G. McNutt and Eva McBride contemplate marrying each other, and have both been married before, and have separate estates, and have children by such former marriages, it is therefore contracted and agreed by the said Henry G. McNutt and Eva McBride, that the

survivor of either shall take and hold no interest, or part of interest, by descent or otherwise, but the estate, both real and personal, shall descend to the heirs the same as it would if they had not married."

We must take as conclusive the finding of the trial court upon questions of fact wherever it is supported by the evidence, and it is only a waste of time to argue in this court that the decision of the trial court is wrong because the weight of evidence is against it.

Eva McNutt was a widow and Henry G. McNutt a widower when this contract was executed. Both were of mature age, and both had children by their former marriages. The former was the owner of one hundred and seventy-two acres of land, which came to her from her first husband, and Henry G. McNutt was also the owner of real property. What personal property the appellant had does not appear.

The contract does not, in formal terms, recite that a consideration moved from the prospective husband to the intended wife, but it does show that it was made in contemplation of marriage, and that each released to the other all interest in each other's property. Here there were two elements of consideration, marriage and the release of a right which, but for the release, would flow from the consummated marriage. These elements of consideration were both of the class valuable. If the contract is to be judged by the ordinary rules of law, then there can be no possible doubt that on its face it imports a sufficient consideration, since a consideration fixed by the parties is by the courts deemed a sufficient one, for the courts will not, in the absence of fraud or mistake, substitute their judgment for that of the contracting parties. *Wolford* v. *Powers*, 85 Ind. 294 (44 Am. R. 16).

If this contract could be regarded as within the general rule, there would be no difficulty in disposing of the case, for there are two distinct elements of consideration embodied in it; but the difficulty arises upon the point made by the appellant, that a contract of this character requires a consid-

eration which the court can affirm is equal to the dower right of a wife. In support of their position counsel refer us to the cases of *Curry* v. *Curry*, 10 Hun (N. Y.) 366, *Gould* v. *Womack*, 2 Ala. 83, *Power* v. *Sheil*, 1 Molloy, 296, and 4 Kent Com. (12th ed.) 56 n. *a*, 1 Bishop Married Women, section 247, and 3 Redfield Wills, 381.

There is much conflict in the authorities; the weight, however, is strongly against the appellant. Many of the modern cases hold that even where the wife has no estate of her own the marriage is of itself a consideration sufficient to support the contract of the prospective wife not to claim any interest in the lands of the husband.

Mr. Schouler clearly marks and defines the distinction—a distinction lost sight of in some of the cases—between a post-nuptial and an antenuptial agreement, shows that both classes are included within the generic term " marriage settlements," and says: " In antenuptial marriage settlements, or what are called ' marriage settlements,' the marriage affords a sufficient consideration." Schouler Domestic Relations, pt. II, chapter XIII, sec. 173.

This is a just deduction from what Mr. Bishop calls " the better authorities." But we are not dealing with a case in which the prospective wife was without property of her own. She was the owner of one hundred and seventy-two acres of land acquired from her first husband. It is true that she did not own the fee, since, by force of our statute, the second marriage cut down her estate to one for life. *Mathers* v. *Scott*, 37 Ind. 303; *Teter* v. *Clayton*, 71 Ind. 237.

But, while she did not have a fee in the land acquired from her first husband, she did have an estate for life. Indeed, she had something more; she had an estate for life with a qualified right of alienation and a possible fee. R. S. 1881, section 2484. *Bryan* v. *Uland*, 101 Ind. 477.

It can not, therefore, be said that she was not the owner of property since she had, at least, a freehold estate. We know that the prospective husband yielded nothing except

the right that might have grown out of a possible fee, and we concur to a great extent in the view of appellant's counsel that he yielded no then present right in the property of his wife. *Prima facie*, at least, he could not have taken any estate in her land at her death, since, upon the happening of that event the children by the first husband would take by descent. While the argument of counsel establishes the proposition that the husband parted with no present and vested rights in the land of the wife, it does not prove that the appellant had not property of her own. The question, therefore, is not what is the rule where the prospective wife is without an estate of her own in land, but what is the rule where she is the owner of at least a freehold estate?

Our judgment is that where the prospective wife is the owner of land in her own right, and there is no fraud, and nothing making the contract unconscionable, the courts will not strike it down. Here there was no fraud. The parties were of mature years. The subject had been long under consideration. There was deliberation, not haste. There is nothing unconscionable in the contract. It was no more than equitable that the prospective husband should, at the time he made the contract, provide that his estate should go to his children by a former wife. It is, indeed, difficult to find any principle upon which courts can set aside contracts made in good faith, with due deliberation, and by persons of mature age, even though that contract be one between a man and a woman contemplating marriage. It is stretching, as many of the authorities suggest, the power of the courts a great ways to declare that a man and woman may not, even though the latter has no estate of her own, make their own contracts. In earlier ages there was, perhaps, some reason for the old English law rule, for women were not educated then as now, and were far more under the dominion of the men than in these days. The reason for the rule has failed, and where the " reason faileth the rule faileth." But whatever may be the rule, where the woman has no estate of her own,

it is different, and it ought to be different, where she has in her own right a freehold estate in land. An illustration will, we believe, prove our conclusion. Suppose the woman's freehold estate to be of great value, yielding an annual income of ten thousand dollars. Why should courts, in such a case interfere and annul an antenuptial contract made and acted upon in good faith? Upon what imaginable ground of public policy could such an interference be justified? If she does own an estate in land, and if there is no fraud, and nothing unconscionable, she should be allowed to judge for herself whether the marriage is of itself a sufficient consideration, and courts should not, after the husband's death, substitute their judgment for hers. The truth is, it is exceedingly difficult to imagine why, in any case where there is no fraud, courts should displace the judgment of contracting parties and substitute their own. No persons in the world can so well and so justly judge as the contracting parties themselves, and it is only in the strongest and clearest cases that courts should disregard their judgment, and never where there is neither positive wrong nor a fraud.

The authorities sustain our conclusion. The case of *Jacobs* v. *Jacobs*, 42 Iowa, 600, is very like the present, and we quote from the opinion in that case : " It is claimed, however, that the contract is unreasonable and without sufficient consideration, and, therefore, ought not in a court of equity to be enforced. * * The law always looks upon marriage as a civil contract, and this marriage seems to have been purely a business transaction. So far as appears, the contract was freely and voluntarily entered into, without any fraud or imposition. One of the parties was a crippled widower, sixty-two years old, with eleven children, and real estate worth $12,000; the other, a widow with three children, forty acres of land and $700 or $800 in money. They were willing to marry, but each wanted the sole control of his or her own property and to transmit it to his or her children." In concluding its observations on this point the court said :

" We can not say but that the advantages are about equal, and the contract is fair and reasonable. We know of no reason why it should not be enforced." In *Wentworth* v. *Wentworth,* 69 Me. 247, the court held an antenuptial contract valid, although it made no provision at all for the woman except that the husband should not intermeddle with her property. The court, in the course of the opinion, said, in speaking of the contract: " It was made in consideration of marriage, although it is not so declared in terms. *Naill* v. *Maurer,* 25 Md. 532. Marriage is the highest consideration known to the law. *Ford* v. *Stewart,* 15 Beav. 499 ; *Maguiac* v. *Thompson,* 7 Pet. 348 ; *Vance* v. *Vance,* 21 Me. 370. Even if it were otherwise, the reciprocal character of the stipulation might well constitute a sufficient consideration. *Naill* v. *Maurer, supra.*" The conclusion of the court in the well considered case of *Forwood* v. *Forwood,* 5 S. W. Rep. 361, is thus expressed : " There is another class of cases that hold (and with which we agree) that an antenuptial contract is a legal contract, the consideration of which may be—*First,* that of the intended marriage alone ; or, *second,* that of a jointure or settlement upon the intended wife in lieu of her dower or distributable share in her intended husband's estate ; and that either of these considerations, if both parties are *sui juris,* is sufficient to uphold the antenuptial agreement on the part of the woman to relinquish her right of dower and distributable share in her intended husband's estate."

In a similar case the Supreme Court of Maryland said : " The contract was made in contemplation of marriage, and, as clearly appears, was intended to bar or prevent the acquisition thereby of any right by either in the property of the other, in order that the marriage proposed might take place. The main object in view was the consummation of the marriage, and it was to that end that the contract was executed. It seemed almost impossible to view the contract as founded on any other consideration, although the reciprocal character of the stipulations might be held to constitute one sufficient

to make the contract binding and effective. But whether the marriage they proposed be expressly mentioned as a consideration or not, we think it must be regarded as such within the purview and meaning of the contract; and we accordingly hold that the contract can not be avoided on that ground." *Naill* v. *Maurer, supra.*

The court in deciding the case of *McGee* v. *McGee,* 91 Ill. 548, thus expressed its view of the law : " The contract, in our judgment, is a reasonable one. It is one that persons advanced in life could, with great propriety, make, and especially where the parties have previously been married, and where there may be children by both marriages, among whom controversies as to property may arise after the death of the parents. Such agreements are forbidden by no considerations of public policy, and there can be no reason why equity will not lend its aid to compel the surviving party to abide the contract. Our opinion is, the fair construction of the antenuptial agreement is, that it intercepts dower of the widow, and may be set up as an effectual bar to her demand for dower in the lands of which her husband died seized." This doctrine was reaffirmed in *Barth* v. *Lines,* 7 N. E. Rep. 679, and the cases of *Wentworth* v. *Wentworth, supra,* and *Andrews* v. *Andrews,* 8 Conn. 79, were cited with approval.

It was said in *Johnston* v. *Spicer,* 107 N. Y. 185, that "Antenuptial contracts, by which it is attempted to regulate and control the interest which each of the parties to the marriage, shall take in the property of the other, during coverture or after death, like dower, are favored by the courts and will be enforced in equity according to the intention of the parties whenever the contingency provided by the contract arises. (2 Kent's Com. 165 ; *Matter of Youngs,* 27 Hun, 54, affirmed, 92 N. Y. 235)."

In the case of *Andrews* v. *Andrews,* 8 Conn. 79, the judge who spoke for the court said : " I can see no reason why such an agreement, deliberately made, and upon sufficient consideration, should not be enforced in chancery. Such con-

tracts, especially in late marriages, are not unusual. They are opposed to no rule of law, nor to any principle of sound policy. On the contrary, they are, in my judgment, highly beneficial, and are eminently entitled to the aid of a court of chancery, where such aid is necessary to carry them into effect; and especially is this true, where the contract has been executed, in good faith, by one of the parties." It was said in the case of *Pierce* v. *Pierce*, 71 N. Y. 154, that "Antenuptial contracts, whereby the future wife releases her claim to her right of dower, and all other rights to the estate of her husband upon his decease, are fully recognized in law. When fairly made and executed without fraud or imposition, they will be enforced by the courts."

Nearer to the case under discussion than those last cited, but in line with them, is the case of *Gelzer* v. *Gelzer*, Bailey Eq. S. C. 387. In that case the court said: "The complainant was of full age, and under no legal disability to contract; the subject-matter was legitimate; and the consideration of marriage is sometimes said to be the highest known to the law; and I confess, that I have not been able to discover any rule, or principle, which discharges her from the obligation, which this agreement imposes. She had an ample fortune of her own, so tied up, that she could not confer it upon the husband; and in consideration, that he would take her in marriage, she agreed not to claim her dower, or any right of inheritance in his estate. It is a contract without fraud, and apparently of perfect equality. Both Atherly and Roper treat this question as one admitting of no controversy. A jointure, to operate as a bar to dower under the statute, must consist of a freehold estate; but a woman, under no legal disability, may stipulate to substitute anything she pleases in place of it. Atherly Marriage Settlements, 511; 1 Roper Husband and Wife, 480."

We pause in our examination of the authorities to say of the case just cited, that the woman's property was entailed, and that the husband could by no possibility take any es-

tate in it, so that he released no right in the woman's property. It is true that in the case cited the woman's fortune was ample, but the extent of her estate, if at all considerable, can not affect the principle involved, since she should be allowed to judge of its sufficiency, and there is no reason why the courts should interfere.

The opinion in *Hafer* v. *Hafer*, 33 Kan. 449, is an elaborate one, gathering and grouping many authorities. It was there said of an antenuptial contract not unlike the present: " It was held in the court below, that the contract was without consideration. Clearly, this is not so. In addition to the reciprocal agreements therein, it has for its support the consideration of marriage, which is not only a valuable consideration, but has been held to be ' the highest consideration known in law,' and is indisputably sufficient to sustain an antenuptial contract."

We can not add to the length of our opinion by further discussion of the decisions of other courts, and turn to some of the decisions of our own court. These decisions do not, indeed, directly decide that a woman who has an estate of her own may execute a valid antenuptial contract founded on the consideration of marriage alone, but we think they do impliedly assert this doctrine.

In *Richards* v. *Richards*, 17 Ind. 636, the provision made by the antenuptial contract was not the equivalent, by any means, of the estate the statute would, but for the contract, have vested in the wife, yet the agreement was held valid. Substantially the same ruling was made in *Houghton* v. *Houghton*, 14 Ind. 505. That we are not in error in asserting that these cases impliedly approve the rule we have stated, is clear, for if they did not, then the conclusion declared could not have been reached, for the provision for the wife was not in either case equal to the right substituted by our statute for that of dower.

We can not in detail speak of all the authorities cited by appellant's counsel, but will briefly notice such as are most

earnestly urged in argument. First in importance of these authorities, in the estimation of counsel, seems to be the case of *Mowser* v. *Mowser*, 87 Mo. 437, but we think it not at all in point, because it rested entirely on a statute of Missouri, and the contract was by parol and not in writing. In *Hollowell* v. *Simonson*, 21 Ind. 398, no question concerning the validity of an antenuptial contract was considered or decided. *Craig* v. *Craig*, 90 Ind. 215, decides that an antenuptial contract can not be revoked by parol after marriage, and *Corey* v. *Corey*, 81 Ind. 469, simply decides that an antenuptial contract may so provide for the wife as to make it proper to deny her alimony. The point affirmed in *The Camden, etc., Ass'n* v. *Jones*, 23 N. J. Eq. 171, is that where the annuity provided by the antenuptial contract fails, so does the contract. *Gibson* v. *Gibson*, 15 Mass. 110, and *Hastings* v. *Dickinson*, 7 Mass. 153, are placed solely on the statute of Henry VIII, and were decided as strictly common law cases, without reference to the equity rule, which, both in England and America, has long been different from the rigid rule of the common law. *Curry* v. *Curry*, 10 Hun, 366, is repudiated by the later cases in the same court and in the court of appeals. It is deservedly and strongly criticised in *Wentworth* v. *Wentworth, supra.* In the case of *Young* v. *Hicks*, 27 Hun, 54, it was said : " The agreement in the present case is a good antenuptial agreement even under the case of *Curry* v. *Curry*, 10 Hun, 366. It makes a provision in lieu of dower and of the rights of the widow in the husband's estate. The principle decided in that case that such a consideration must be proven to uphold an agreement made in contemplation of marriage does not seem to be supported by any good reason."

The disapproval of *Curry* v. *Curry, supra,* is repeated in *Clark* v. *Clark*, 28 Hun, 509, where it was said : " We can not concur in the observation of the learned judge in that case, that antenuptial contracts are against public policy. On the contrary, we think that the current of decisions respect-

ing marriage settlements shows that when such contracts are freely and fairly entered into, they are generally conducive to the welfare of the parties thereto and subserve the best purposes of the marriage relation."

The Supreme Court of New York, judged by its latest utterances, may, therefore, be regarded as strongly against the appellant, and in line with the great majority of the modern courts.

The case of *Grogan* v. *Garrison*, 27 Ohio St. 50, confuses postnuptial with antenuptial contracts, and applies to the latter class of contracts the rules applicable to the former. This error led to a wrong conclusion, for it led the court to apply a statute applicable only to conveyances and contracts made after marriage to contracts made before marriage. That this is true is apparent from what is said on pages 59 and 62 of the opinion. But if it were conceded that the case cited is rightly decided, still, it would not be applicable here, for in that case there was absent an important element which is here present; this element is the fact that the wife had a separate estate of her own.

The later case of *Mintier* v. *Mintier*, 28 Ohio St. 307, lays down an essentially different rule from that laid down in the former case, for it was there said : " If the antenuptial agreement in this case was intended by the parties to operate as an equitable jointure, and as such to bar all claims of the wife to dower in the real estate of the husband ; if the parties were of mature age, and capable of judging in respect to their interests ; if the agreement was fairly entered into in good faith, and without any fraud or imposition ; if it was reasonable in its terms, and was in good faith acted upon and carried into effect by Robert Mintier during his life, no good reason is perceived why full effect should not be given to it, according to the intention of the parties."

In the earlier case of *Stilley* v. *Folger*, 14 Ohio, 610, the court said : " Antenuptial contracts have long been regarded as within the policy of the law, both at Westminister and in

the United States. They are in favor of marriage and tend to promote domestic happiness, by removing one of the frequent causes of family disputes, contentions about property, and especially allowances to the wife. Indeed we think it may be considered as well settled, at this day, that almost any *bona fide* and reasonable agreement, made before marriage, to secure the wife in the enjoyment either of her own separate property, or a portion of that of her husband, whether during the coverture or after his death, will be carried into execution in a court of chancery."

It is evident that in Ohio the rule, as laid down by the well considered cases, is not very different from what we have embodied in our conclusion and stated as the rule applicable to this particular case. We have restricted our statement of the rule because it is not here necessary for us to make our statement broader, but we may appropriately say that the cases go very far to support the rule as thus stated by Mr. Freeman in his note to the case of *Merritt* v. *Scott*, 50 Am. Dec. 372: "The marriage itself is the consideration of the settlement, and it is the highest consideration known to the law."

Mr. Bishop employs even stronger language : " To say, therefore, that it is to be regarded, where it is the inducement to any contract, as a valuable consideration, is to utter truth, yet only a part of the truth. What this utterance lacks is, in our books, not unfrequently expressed by the adjective 'highest;' as 'marriage is the highest consideration known in law.'" 1 Bishop Married Women, section 775.

No particular form of words is necessary to constitute a valid antenuptial contract. However informal the instrument may be, it will be given effect if the intention of the parties is manifested, and it is such as can at law or in equity be executed. "This sort of agreement," says an eminent text-writer, " will, of course, vary in its terms, according to the inclinations of the parties ; but, without regard to such variations, it should be held, alike on principle and on the

better authorities, to exclude dower where such is the plain intent of the parties." 1 Bishop Law of Married Women, section 423. In truth, not only do the authorities affirm that no formality is required, but they go further and declare that such contracts are to be construed with liberality and favor. They will be upheld if possible, and not overthrown, unless the necessity leading to that result is imperious. As Mr. Schouler says: "Equity pays no attention to the externals, but considers only the substantial intention of the parties." Schouler Domes. Rela., section 176. The cases enforce and illustrate this rule in many forms. *Neves* v. *Scott*, 9 How. 196; *Hooks* v. *Lee*, 8 Iredell Eq. 157; *Smith* v. *Moore*, 3 Green Ch. 485; *Johnston* v. *Spicer, supra,* and cases cited; *Hafer* v. *Hafer, supra.*

It has even been held that letters between the parties, although informal, will be sufficient evidence of the contract. *Logan* v. *Wienholt*, 1 Cl. & F. 611; *Hammersley* v. *De Biel*, 12 Cl. & F. 45; *Kinnard* v. *Daniel*, 13 B. Mon. 496; *Peck* v. *Vandemark*, 99 N. Y. 29.

Reason and authority are both in favor of a liberal construction of these contracts, for their purpose is to prevent strife, secure peace, adjust rights, and settle the question of marital rights in property. From the earliest years of the law the courts of chancery, rejecting the iron rules of the common law, have favored contracts of this character, and this rule of equity has been engrafted into the body of American jurisprudence. *Andrews* v. *Andrews, supra; Pierce* v. *Pierce*, 71 N. Y. 154; *Barth* v. *Lines*, 7 N. E. Rep. 679; *Jacobs* v. *Jacobs, supra; Beard* v. *Beard*, 22 W. Va. 130; *Shuee* v. *Shuee*, 100 Ind. 477; *Wright* v. *Jones*, 105 Ind. 17–27.

Measuring this contract by the rules of law, reading it by the light of the attendant circumstances, and looking to the object the parties intended to accomplish, there can be no doubt as to the effect that should be given its provisions. Those provisions were intended to constitute a valid mar-

riage settlement, and they do constitute such a settlement, divesting the wife of all interest in the husband's property, and freeing hers from any possible claim that he might otherwise have. The contract not only freed the wife's land from a claim upon the interest held by her at the time the contract was made, but it frees it from all interest which . she might subsequently acquire. *Cole* v. *American Baptist, etc., Society,* 14 Atlantic R. 73. It not only governs as to her fixed interest, but also as to the possible or contingent interest which she had in the land when she entered into the contract. It is a mistake, therefore, to assert that there was no interest released except that fixed and vested when the contract was made, for the contract operated upon possible and contingent interests as well as upon the then present and vested estate.

To remove all claims to each other's property was, it is very plain, the leading purpose of the parties, and the court would do wrong to frustrate that purpose. The contract has long existed, has been acted upon, one of the parties is dead, and the courts can not do otherwise than read the contract as the parties wrote it and as they intended it should be read.

Turning from the main path to a point which counsel make, and which leads us aside, we affirm that the fact that a promise to marry was made six years before the writing was drawn and signed does not impeach the consideration of the contract. The written instrument, as the authorities agree, merges mere oral negotiations, expresses the matured agreement of the parties and supplies the best evidence upon the subject of property rights. If parties put in writing their agreement concerning their property and subsequently marry, the agreement, as written, is the source of evidence, and furnishes conclusive proof of the matured and final contract. But if there were doubt as to our statement and application of this elementary principle, still the extraneous evidence is strongly against the appellant upon this question, for it shows

that she made the final agreement to marry only upon terms such as those expressed in the writing. Her declarations, expressed in language much more emphatic than elegant, show that she exacted the contract, and that without it she would not have taken McNutt as her husband. Both the parol and the written evidence show that the contract was made in consideration of marriage, and that not only that consideration, but the further consideration that each should release all rights in the other's property, entered into the contract, and give support to the agreement.

The child of Henry G. McNutt, by his first marriage, died before he did, leaving no children. The appellees are the brothers and sisters and nephews and nieces of Henry G. McNutt. The appellant's counsel insist that even if the validity of the antenuptial contract be affirmed, still the appellees can not take to the exclusion of the appellant because the marital rights of the widow are barred only in favor of the lineal descendants of the husband. Counsel thus state their propositions :

"The appellees being only collateral relations of Henry G. McNutt, and there being no limitation in the contract for their benefit, they are not within the consideration of the antenuptial contract, but are mere volunteers, and can not enforce the provisions of that contract against appellant.

"The term ' heirs,' as used in the antenuptial contract, relates to the then living children of Henry G. McNutt and of Eva McBride, who are specifically mentioned in the contract, and is not used in its technical sense at all. It follows that, the contract having been made for the benefit of Lawrence McNutt only, the appellees can not have it specifically performed for their benefit."

The position of counsel is untenable. The word "heirs" is one of the strongest and most expressive terms in the law. *Allen* v. *Craft*, 109 Ind. 476, 480 (58 Am. R. 425) ; *Shimer* v. *Mann*, 99 Ind. 190 (50 Am. R. 82) ; *Hochstedler* v. *Hochstedler*, 108 Ind. 506. Where this word is employed it will

be given its settled legal meaning, unless the context shows in the clearest and most decisive manner that the parties who used it intended that it should have some other meaning. *Allen* v. *Craft, supra; Shimer* v: *Mann, supra; Jesson* v. *Wright,* 2 Bligh (H. L. Cases), 1 (56); *Doe* v. *Gallini,* 5 B. & Ad. 621; *Lees* v. *Mosley,* 1 Y. & Coll. Ex. Cases, 589; *Powell* v. *Board,* etc., 49 Pa. St. 46 (53); *Robins* v. *Quinliven,* 79 Pa. St. 333; *Den* v. *Emans,* 2 Pen. (N. J.) 522. Where there is doubt, say the authorities, the word will be taken in its accepted legal signification. Heirs are lineal and collateral, but the generic term includes both classes. Children in the lifetime of the parents may be heirs presumptive, but they are not heirs. *Schoonmaker* v. *Sheely,* 3 Denio, 485; 1 Preston on Estates, 367. It is an ancient maxim that "No one can be an heir during the lifetime of his ancestor." But in this instance the context of the instrument and the attendant facts very satisfactorily show that the parties intended to bar the rights of each in the property of the other, and to secure it to their respective descendants. The appellees are the heirs of Henry G. McNutt, and as heirs entitled to the real property of which he died seized. *Cole* v. *American,* etc., *Society, supra.*

Another proposition of counsel is thus stated : " But even if the term ' heirs ' be given its strict technical meaning, it does not avail appellees, because by operation of law, which she can not prevent, appellant is the only ' heir ' of Henry G. McNutt, and appellees are not his heirs at all. She could not by contract change her legal status."

There is a fallacy in this statement, for it contains covert assumptions which are not only unproved, but which are incapable of proof. It is not true that an antenuptial contract changes the status of the woman. This is evident because : 1st. When it was made she was not a *feme covert.* 2d. It does not affect the status of the wife, when the marriage takes

place, but simply the property of the husband and the wife respectively. 1 Bishop Married Women, section 427.

It is unduly assumed that the law absolutely casts upon the wife an estate in the lands of the husband; whereas it does not undertake to do so where by agreement the parties have fixed the rule which shall govern. The law operates in cases where there is no contract, but does not operate where the parties have for themselves agreed upon the mode in which marital rights shall attach. The law does not assume to override the agreement of the parties, but to furnish a rule where there is no agreement. To be sure, there must be an effective agreement or conveyance; if there is not the law will prevail.

There is little, if any, diversity of opinion upon the general proposition that parties may by contract intercept the line of descent, although there is some conflict as to what must be shown to support the contract. The rule long has been that dower and kindred rights may be excluded by the contract of the parties. 1 Bishop Law of Married Women, 427.

Speaking of contracts of this class, Mr. Bishop says: " It is doing what is done every day in other things,—namely, providing a rule by agreement to be applied instead of the rule which the law would furnish in the absence of an agreement." 1 Bishop Married Women, section 418.

The rule as we have stated it is affirmed by the text-writers, and has been declared and enforced by many courts. *Naill v. Maurer, supra; Wentworth* v. *Wentworth, supra; Pierce v. Pierce, supra; De Barante* v. *Gott,* 6 Barb. 492; *Beard* v. *Beard,* 22 W. Va. 130; *Charles* v. *Charles,* 8 Gratt. 486; *Spiva* v. *Jeter,* 9 Rich. Eq. 434; *Merritt* v. *Scott,* 6 Ga. 563 (50 Am. Dec. 365).

The decision in the case of *Wiseman* v. *Wiseman,* 73 Ind. 112, does not lend any support to the argument of appellant's counsel, but, on the contrary, is in direct hostility to it. " Under our statute," said the court in that case, " a surviving wife, who has not conveyed or relinquished her interest in the property of the husband, or accepted a jointure,

or received a valid antenuptial settlement, can be deprived of her rights in the land of her deceased husband for one cause, and for one cause only."

There is, it is obvious, a full recognition of the validity of antenuptial contracts, and not a denial, in the decision from which we have quoted. We conclude this phase of the subject by a quotation from one of our approved text-books, and here assert it as the rule of decision. The author, after commenting on the decided cases, says: " It is but a step from such a case as this to another one of which there are several in the books, where the parties agree beforehand that, after marriage, each shall hold his or her antenuptial property to his or her separate use, and on the death of one of them, neither shall have any marital claim on the estate of the other. This is, at least in a court of equity, generally esteemed to be a good bar to dower." 1 Bishop Law of Married Women, section 423.

Counsel state an argument in the form of a question thus:

" Was not the agreement not to claim marital rights an agreement not to claim a future demand not then in existence? If so it was void."

This is substantially nothing more than a re-statement of an argument of which we have already disposed, but, as it will serve to put our position in a stronger and clearer light, we will give Mr. Bishop's refutation of such arguments: " The principle governing these cases," says he, " it should be remembered, is, not that the antenuptial contract consti-- tutes a release of dower—for a thing not existing can not be released—but it is an undertaking not to claim dower—an introduction of a rule by agreement differing from the one which the law provides in the absence of an agreement. For the principle is well settled, that, though parties marrying must take the status of marriage as the law has established it, and can not vary it by antenuptial contract, yet, within certain legal limits, and proceeding by a legal rule, they may by such contract vary any or all of those property rights

which the status superinduces." 1 Bishop Law of Married Women, section 427.

The argument that the appellant is an heir of Henry G. McNutt, and, therefore, entitled to the land, is fallacious. It is very clear that the agreement was meant to exclude her, and that it does exclude her from the inheritance. The object of the agreement was to bar her rights in the land of her husband. This was the plain intention of the parties, and that intention must prevail. To award her an interest would be to give her what the contract plainly denies her, and thus thwart the intention of the parties and defeat their agreement. But counsel are in error in assuming that a widow is an heir of her deceased husband in the legal sense of the term. As said in *Unfried* v. *Heberer*, 63 Ind. 67: "A widow is an heir of her husband only in a special and limited sense, and not in the general sense in which that word is usually used and understood." In *Brown* v. *Harmon*, 73 Ind. 412, and *Wood* v. *Beasley*, 107 Ind. 37, it was held that where a testator devised land to his widow as long as she should remain his widow, and directed that upon her marriage it should go to his heirs, the widow could not claim as heir. These cases rule here. They simply announce that courts will give effect to the manifest purpose of testators and contracting parties, and that where it appears that a widow was not intended to be dealt with as an heir, she can acquire no rights in that capacity.

It is argued by counsel that the complaint asserts that the appellees have a legal title, and that they can not recover upon the title proved, because it is an equitable one. In support of this contention we are referred to the cases of *Stout* v. *McPheeters*, 84 Ind. 585; *Burt* v. *Bowles*, 69 Ind. 1; *Brown* v. *Freed*, 43 Ind. 253; *Nichol* v. *Thomas*, 53 Ind. 42; *Rowe* v. *Beckett*, 30 Ind. 154; and *Stehman* v. *Crull*, 26 Ind. 436.

We think that the only case that applies here is *Burt* v. *Bowles*, *supra*, and that the decision in that case is adverse to

the appellant. This we say, because the second paragraph of the complaint specifically sets forth the title of the appellees, and the evidence establishes the substance of the issue tendered by that paragraph. Under the ruling in *Burt* v. *Bowles, supra*, this entitles the appellees to a recovery. The facts alleged in that paragraph entitled the appellees to recover possession of the real estate, and it is the facts, and not the prayer, that control. But if it were conceded that the form of the judgment was not correct, still, as the appellant did not move to modify it, he can not now present that question. Many cases hold that objections to a judgment must be presented by the proper motion to the trial court, or they will not be regarded on appeal. There is still another reason why there can be no reversal, and that is furnished by section 658 of the code, which provides that no judgment shall be reversed "where it shall appear to the court that the merits of the cause have been fairly tried and determined in the court below."

There was no error in admitting parol evidence of the contents of the antenuptial contract. There was evidence tending to show that it had been destroyed by the appellant, and this, combined with the evidence that it once existed, was sufficient to let in secondary evidence.

It was within the discretion of the trial court to hear the testimony of a witness, although it was not offered until after the evidence had been closed. We can only interfere where there is a clear abuse of discretion resulting in injustice, and we can not hold that there was such an abuse of discretion in this instance.

Judgment affirmed.

Filed Dec. 11, 1888; petition for a rehearing overruled March 13, 1889.