**The ESTATE of Mae L. GILLILAN, Deceased, John L. Lee, Administrator, Plaintiff-Appellant,**

v.

**The ESTATE of Charles S. GILLILAN, Deceased, Anderson Banking Company, Executor, Defendant-Appellee.**

**No. 2–477A142.**

Court of Appeals of Indiana, Fourth District.

June 30, 1980.

---

Philip Greene Decker, II, Decker, Lockwood & Swick, Anderson, for plaintiff-appellant.

Philip S. Cooper, Busby, Austin, Cooper & Farr, Robert L. Shearer, Sr., Bagot, Free, Shearer & Miller, Anderson, John P. Price, Robert T. Thopy, Bingham, Summers, Welsh & Spilman, Indianapolis, for defendant-appellee.

MILLER, Presiding Judge.

Shortly before their marriage in 1959, Charles and Mae (Lee) Gillilan entered into an antenuptial agreement in which Charles agreed that if he predeceased Mae, she would receive the entire net income from his estate during the term of her natural life. They lived together as husband and wife until Charles' death in 1975. The numerous provisions of his will in substance provided Mae with the income from his assets but placed a ceiling on said income, raising the question as to whether or not

the antenuptial agreement of the parties was breached. Mae filed her election to take against Charles' will taking the position that the antenuptial agreement had been rescinded. However, she died five months after Charles' death and the ensuing litigation was between Charles' Estate and Mae's Estate. The controversy was resolved by the trial court, after it examined the pleadings and stipulations of the parties, by summary judgment in which it found the antenuptial agreement should be enforced by its terms, and declared unenforceable the election to take against the will filed by Mae. Mae's Estate appeals from this judgment.

Essentially, we must answer the contention by Mae's Estate that, by reason of Charles' execution of his will which allegedly did not comport with the antenuptial agreement, Mae had the right to treat the agreement as rescinded and unenforceable. The trial court rejected this contention. We agree and affirm.

On January 1, 1959 the Gillilans executed the Antenuptial Agreement in question which provided:

"THIS AGREEMENT, made and concluded by and between CHARLES S. GILLILAN, residing at 190 North Portage Path, Akron, Ohio, herein called the First Party, and MAE L. LEE, residing at 705 N. Hendricks Street, Anderson, Indiana, herein called the Second Party,

WITNESSETH:

WHEREAS, the parties contemplate marriage with each other, and

WHEREAS, each party possesses certain property acquired during his or her prior marriage and each has disclosed to the other the extent and probable value of such property as nearly as the same can be ascertained, and

WHEREAS, each party, by reason of such prior marriage, has formulated certain plans relating to the disposition of his or her property in the event of death, and the parties desire that their marriage shall not substantially change such plans,

NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS:

1. The First Party shall, during the continuance of his marriage with the Second Party, provide a home and maintain and support the Second Party.

2. That if the First Party shall survive the Second Party, the First Party shall not, as surviving husband, make any claim to any part of the estate of which the Second Party may be seized or possessed; and the First Party, in consideration of said marriage, hereby expressly waives and relinquishes all right in and to the real property of which the Second Party may die seized, as well as all right in and to the personal estate of the Second Party, whether as surviving husband, heir-at-law, or otherwise.

3. That the First Party agrees that if the Second Party shall survive him, the Second Party shall receive from the estate of the First Party and the heirs, executors, administrators or legal representatives of his estate shall pay to her, *the entire net income from his estate for and during the term of her natural life, the same to be in full satisfaction, payment and discharge of any and all claims that the Second Party may have to dower, or homestead rights, in any and all real property of which the First Party may die seized, as well as in full satisfaction, payment and discharged of any and all other claims that the Second Party may have as his widow, or heir-at-law, to an allowance, or widow's award, or to any part of his real and/or personal estate.*

4. That in consideration of said marriage, the Second Party agrees that, if she shall survive the First Party, she will make no claim to any part, or share, of the real and/or personal estate of which the First Party may die seized or possessed, except as to the net income therefrom for and during the term of her natural life; and the Second Party hereby waives and relinquishes all claims to an allowance, dower, homestead, widow's award, or any other right in and to the real and personal estate of which the First Party may die seized or possessed, except to the net income therefrom.

5. That except as otherwise provided in Paragraphs 3 and 4 hereof, neither party hereto, by virtue of said marriage, shall have, or acquire, any right, title or claim in and to the real or personal estate of the other, but the estate of each shall descend to or vest in, his, or her, heirs-at-law, legatees, or devisees, as may be prescribed by his, or her last will and testament, or, in default of such last will and testament, by the law then in force, as though no marriage had ever taken place between the said parties.

6. That if either party shall mortgage, pledge, or sell and convey, his or her real or personal estate, whether in whole or in part, the other party hereto shall, upon demand, from time to time, join in any and every mortgage, or deed of conveyance, or in any other instrument that may be necessary or desirable to make the same effectual.

7. That this Agreement is entered into by the parties hereto with full knowledge on the part of each of the extent and probable value of all of the property or estate of the other, and of all rights that, but for this Agreement, would be conferred by law upon each of them, in the property or estate of the other, by virtue of the consummation of the said proposed marriage, and the rights of the respective parties hereto in and to each others property, or estate, of whatsoever character the same may be, shall be determined, fixed and settled by this Agreement, and not otherwise.

8. This Agreement shall not prevent either party, during marriage, from adding to the provisions herein made for the other, nor from making gifts to the other from time to time, if he or she may desire, and such gifts shall be in addition to any monies and property herein agreed to be paid and delivered to the other, upon the death of the one so dying.

9. This Agreement shall bind the parties hereto and their respective heirs, administrators and assigns, and shall become effective only upon the consummation of the proposed marriage between the parties hereto, and if such marriage does not take place, this Agreement shall be null and void." (Emphasis added).

The agreement was properly executed. Charles and Mae were subsequently married on May 9, 1959 and lived together as husband and wife until Charles died testate on May 28, 1975. Charles' will and first codicil thereto were admitted to probate. The provisions in the will and Codicil beneficial to Mae are summarized as follows:

*ARTICLE II.*—Mae was given a life estate in all of Charles' personal effects, jewelry, household goods and furnishings.

*ARTICLE IV AND CODICIL—ARTICLE II.*—If Mae survived Charles, $150,000 was to be held in a trust [1] ($150,000 Trust) from which Mae was to receive $7,500 annually until her death. In the year of her death, she was to receive a pro-rata share thereof. The obligation to pay Mae commenced upon Charles' death; however the will provided payment could be deferred until the end of the taxable year when the trust was funded. At this time Mae was entitled to the deferred amount plus 6% interest compounded annually.

*ARTICLE V.*—After the foregoing provisions and Article 1 [2] had been complied with and if Mae survived Charles, then a trust [3]

1. This trust was intended to qualify as a charitable remainder trust as defined in Section 664(d)(1) of the Internal Revenue Code.

2. Article I provided:
"I direct that all my lawful debts, funeral expenses and expenses of my last illness be paid as soon after my death as may be practicable, except that any debts secured by mortgage or pledge of real or personal property may be postponed by my Executor, in its discretion. I direct my said Executor to pay all estate, inheritance, transfer and/or succession taxes which may be imposed or assessed upon my property or estate or upon any bequest, devise or interest passing hereunder or passing upon my death by operation of law, by contract or otherwise. My said Executor shall not seek nor be entitled to reimbursement from any devisee or beneficiary hereunder, or from any surviving joint owner, life insurance beneficiary or tenant by the entirety for any tax so paid."

3. This trust was intended to qualify as a charitable remainder unitrust as defined in Section 664(d) of the Internal Revenue Code.

of $23,000 ($23,000 Trust) was to be established and Mae was to receive the net income therefrom for life.

*ARTICLE VI AND CODICIL ARTICLE III.*—If Mae survived Charles, the residuary of his estate was to be held in trust. (Residuary Trust). Mae was to receive therefrom a unitrust amount equal to 5% of the net fair market value of the trust assets as valued on the first day of each taxable year of the trust. This amount was to be paid first from income and to the extent the income was insufficient then from principal. Any income from the trust in excess of the 5% was to be added to principal. The obligation to pay Mae was to commence at Charles' death; however, such payment could be deferred until the trust was fully funded. In the year of her death Mae was to get a fractional portion of the 5% amount.

*ARTICLE IX.*—If Mae were ever disabled, the trustee was given discretionary power to pay the trust sums payable to her to any person, firm, or corporation supplying her goods or services and to any person with whom she was residing or with responsibility for her care or custody.

*ARTICLE XI.*—During the interim period commencing with Charles' death and ending when the $150,000 Trust was fully funded and so long as it did not conflict with the tax advantages provided for in the clauses establishing the $150,000 Trust and the Residuary Trust, Mae was to be given "such portion of the income of my [Charles'] Estate that it [the Executor] determines to be desirable for her support, health and maintenance, but not less than $600.00 nor more than the income subject to United States Income Tax as calculated on the fiduciary returns filed by my Executor".

The will further provided that at Mae's death (1) the household goods were to be distributed to various specifically enumerated beneficiaries: (2) the principal and accumulated income of the $150,000 Trust was to go to Adrian College, half for the establishment of Lena Beam Gillilan Endowment fund and half for the establishment of the Charles and Lena Beam Gillilan Lecture Program in Business Administration: (3) the principal of the $23,000 Trust was to be distributed among the United Methodist Home on College Hill ($1,000), Clairbourne Township Mausoleum Association ($2,000), Patricia Gillilan, his niece, ($1,000), Mary Caroline Kanzmann, the niece of his deceased first wife, Lena Beam Gillilan, ($10,000), Virginia Lee Weed, daughter of Mae ($1,000), Chester C. Weed Jr., husband of Virginia Lee Weed ($1,000), John L. Lee, son of Mae ($1,000), and John L. Lee Jr., Michael B. Lee, Deborah J. Lee, Claudia L. Weed and Jennifer L. Weed, all grandchildren of Mae ($1,000 each), and (4) the principal and accumulated income of the residuary trust was to be distributed to the First United Methodist Church ($55,000) in memory of John W. Lambert, Mae's deceased father, to Community Hospital of Anderson and Madison County, Incorporated ($1,000) and to Ohio Wesleyan University for the establishment of the "Charles S. and Mae Lambert Gillilan Endowment Fund."

On October 8, 1975 Mae filed an Election to take against Charles' will pursuant to Ind.Code 29–1–3–1, 3.[4] On October 27, 1975

---

4. Ind.Code 29–1–3–1:

"When a married person dies testate as to any part of his estate, the surviving spouse shall have a right of election to take against the will under the limitations and conditions hereinafter stated.

(a) The surviving spouse, upon election to take against the will, shall be entitled to one-third [⅓] of the net personal and real estate of the testator; provided, that if the surviving spouse be a second or other subsequent spouse who did not at any time have children by the decedent and the decedent left surviving him a child or children or the descendants of a child or children by a previous spouse, such surviving second or subsequent childless spouse shall upon such election take one-third [⅓] of the net personal estate of the testator plus a life estate in one-third [⅓] of the lands of the testator.

In determining the net estate of a deceased spouse for the purpose of computing the amount due the surviving spouse electing to take against the will, the court shall consider only such property as would have passed under the laws of descent and distribution.

(b) When the value of the property given the surviving spouse under the will is less than the amount he would receive by electing to take

Mae died intestate and John L. Lee was appointed Administrator of her estate. On December 9, 1975 Charles' Estate filed the antenuptial agreement set forth in full earlier in this opinion, accompanied by a pleading alleging such agreement rendered Mae's election "wholly ineffective". Mae's estate responded, on December 19, 1975 with its "Objections to the Filing of Antenuptial Agreement and Petition to Set said Antenuptial Agreement Aside as Null, Void and Unenforceable".

On January 23, 1976 Mae's Estate filed its motion for summary judgment alleging generally that Charles, by executing his last will and first codicil thereto (and Charles' Estate by probating same), breached the Antenuptial Agreement by establishing the intention of both Charles and his Estate to disregard the Agreement and consider it rescinded. Moreover, it claimed Mae's election against the will ratified the rescission and the Antenuptial Agreement was, therefore, rescinded, null, void and unenforceable.

On April 5, 1976 Charles' Estate filed its motion for summary judgment admitting the language of Article XI of the will which provided funds for Mae during the period before the establishment of the trusts constituted a partial breach of that portion of the antenuptial agreement which specifically provided Mae was to receive "the entire net income from his estate for and during her natural life". Despite the admitted breach, Charles Estate claimed the Antenuptial Agreement should be enforced by its terms.[5]

In reviewing these motions the trial court had before it the record including pleadings and the following stipulations of the parties:

"Comes now the ANDERSON BANKING COMPANY, Executor of the Last Will and Testament of Charles S. Gillilan, Deceased, by and through its special attorneys, Bagot, Free, Shearer and Miller by Robert L. Shearer; and John L. Lee,

against the will, such surviving spouse may elect to retain any or all specific bequests or devises given him in the will at their fair market value as of the time of such election and receive the balance due him in cash or property.

(c) In electing to take against the will, the surviving spouse is deemed to renounce all rights and interest of every kind and character in the personal and real property of the deceased spouse, and to accept such elected award in lieu thereof.

(d) When a surviving spouse elects to take against the will, he shall be deemed to take by descent, as a modifixed [modified] share, such part of the net estate as does not come to him by the terms of the will. Where by virtue of an election pursuant to this article [29–1–3–1— 29–1–3–8] it is determined that such spouse has renounced his rights in any devise, either in trust or otherwise, the will shall be construed with respect to the property so devised to him as if such surviving spouse had predeceased the testator."

Ind.Code 29–1–3–3:

"(a) The election to take the share hereinabove provided shall be in writing, signed and acknowledged by the surviving spouse or by the guardian of his estate and shall be filed in the office of the clerk of the court. It may be in the following form:

I, A.B., surviving wife (or husband) of C.D., late of the county of _____ and state of _____, do hereby elect to take my legal share

in the estate of the said C.D. and I do hereby renounce all provisions in the will of the said C.D. inconsistent herewith.

Signed,
(Signature)
(Acknowledgement)

(b) Said election shall be recorded by such clerk in the record of wills, marginal reference being made from such record to the book and page in which such will is recorded, and from the record of such will to the book and page where such election is recorded.

(c) The clerk shall cause a copy of said election to be served upon the personal representative and his attorney of record by United States mail addressed to such persons at their respective addresses as shown by the petition for probate of will and appointment of personal representative."

5. In the motion the executor alleged "the total income from the date of the death of Charles S. Gillilan to the date of death of Mae L. Gillilan is Seven Thousand Four Hundred Forty-Eight Dollars ($7,448), the amount which the Executor owes to the Administrator of the Estate of Mae L. Gillilan under the terms of the Antenuptial Agreement entered into between both decedents." We note the provision of the Antenuptial Agreement provided for the "entire *net* income" (emphasis added). The judgment of the trial court did not include any specific dollar amount.

Administrator of the Estate of Mae L. Gillilan, Deceased, by and through its attorneys, Decker, Lockwood & Swick by Philip Greene Decker, II, and in connection with the Motion of John L. Lee, Administrator, for Summary Judgment, filed in the Estate of Charles S. Gillilan on January 23, 1975, and the Motion for Summary Judgment of Anderson Banking Company, Executor of the Estate of Charles S. Gillilan, filed on April 15, 1976, stipulate and agree to the following facts:

1. That on the 1st day of January, 1959, Charles S. Gillilan and Mae L. Lee executed an Antenuptial Agreement, said Agreement is attached hereto, included by reference, and shown as "Exhibit A".

2. That on the 9th day of May, 1959, Charles S. Gillilan and Mae L. Lee were married.

3. That said Charles S. Gillilan and Mae L. Gillilan lived and cohabited together as husband and wife from May 9, 1959, until May 28, 1975, on which date the said Charles S. Gillilan died testate.

4. That the Last Will and Testament and First Codicil thereto of Charles S. Gillilan, dated January 10, 1974, and February 14, 1974, respectively, were duly admitted to probate in the Superior Court of Madison County, Indiana, on the 4th day of June, 1975, and said estate was designated as E75-147. Said Last Will and Testament and First Codicil thereto is attached, included by reference, and shown as "Exhibits B and C". That the Anderson Banking Company was appointed and qualified as Executor of said estate.

5. That on the 8th day of October, 1975, Mae L. Gillilan did cause to be filed her duly executed "Election to Take Against the Will" of Charles S. Gillilan in said Gillilan estate proceedings pursuant to Burns Indiana Statutes Annotated 29–1–3–1 and 29–1–3–3. Said "Election to Take Against the Will" is attached hereto, included by reference, and shown as "D".

6. That on October 27, 1975, Mae L. Gillilan died intestate and John L. Lee was appointed Administrator of said Estate.

7. That on December 9, 1975, Anderson Banking Company, as Executor of the Estate of Charles S. Gillilan, Deceased, filed the Antenuptial Agreement between the said Charles S. Gillilan and Mae L. Lee, dated January 1, 1959, and caused the same to be recorded by the Clerk of the Superior Court of Madison County in the Record of Wills pursuant to statute, with direction that copies of said Agreement be served upon John L. Lee, personal representative of the Estate of Mae L. Gillilan, and upon Philip Greene Decker, II, attorney for John L. Lee.

8. That on December 19, 1975, John L. Lee, Administrator, filed in said estate proceeding of Charles S. Gillilan, deceased, "Objections to the Filing of Antenuptial Agreement and Petition to Set said Antenuptial Agreement Aside as Null, Void and Unenforceable", all as stated therein, said Objections are attached hereto, included by reference and shown as "Exhibit E".

9. That on January 23, 1976, John L. Lee, Administrator, caused to be filed a "Motion for Summary Judgment" and supporting Memorandum, essentially raising the same objections and matters set forth in said Motion and Petition of December 19, 1975. Said Motion and Memorandum are attached hereto, included by reference and shown as "Exhibit F". The parties to the Motion for Summary Judgment, the Estate of Charles S. Gillilan and the Estate of Mae L. Gillilan, agree that said Motion and Petition of John L. Lee, filed December 19, 1975 is incorporated in said Motion for Summary Judgment, and that the Court's determination of said Summary Judgment Motion will obviate the necessity of ruling upon said Motion and Petition filed December 19, 1975.

10. On April 15, 1976, Anderson Banking Company, Executor of the Last Will and Testament and First Codicil of Charles S. Gillilan, Deceased, filed its Motion for Summary Judgment, included by reference as Exhibit "G".

[EXHIBITS OMITTED].

The trial court entered the following judgment:

"IT IS THEREFORE ORDERED ADJUDGED AND DECREED that no material issue of fact exists and that the Executor of the last will and testament of Charles S. Gillilan, deceased, is entitled to a judgment as a matter of law against the Administrator of the estate of Mae L. Gillilan.

It is further ordered and decreed that the antenuptial agreement between Charles S. Gillilan and Mae L. Lee be enforced by its terms."

It is further ordered and decreed that the Election to Take Against the Will of Charles S. Gillilan, deceased, filed by Mae L. Gillilan is unenforceable."

 Since the parties have thus stipulated the facts relevant to this appeal and have not suggested in their briefs there are remaining material factual issues, the question for this Court on review is whether Charles' Estate was "entitled to judgment as a matter of law," Ind. Rules of Procedure, Trial Rule 56, that is, whether the trial court was correct in entering summary judgment in favor of Charles' Estate because the antenuptial agreement entered into between Charles and Mae was not rescinded or revoked.[6] As noted above, Mae's Estate contends Charles' execution of his will operated as a "unilateral offer of rescission" on his death which was accepted by Mae when she elected to take against the will, and that the execution of the will was an expression during Charles' life of his intention not to be bound by the antenuptial agreement.[7]

 In considering an antenuptial agreement we are cognizant of certain well recognized principles of law which are applicable. It is settled that antenuptial contracts entered into between an adult husband and adult wife in contemplation of marriage are favored by the law in that they tend to promote domestic happiness and adjust property questions which might otherwise become the source of much litigation, and, as often pointed out, the marriage itself is the consideration for such agreements which perhaps may be the most valuable and highly respected consideration of the law. No formality is required, and such agreements are given a liberal rather than a strict construction, and a construction will be given in each case giving effect, if possible, to the intention of the parties. *Moore v. Harrison*, (1901) 26 Ind.App. 408, 59 N.E. 1077; *Mallow v. Eastes*, (1913) 179 Ind. 267, 100 N.E. 836; *Roush v. Hullinger*, (1949) 119 Ind.App. 342, 86 N.E.2d 714; *McNutt v. McNutt*, (1889) 116 Ind. 545, 19 N.E. 115; *Bishop on the Law of Married Women*, Vol. 1, § 427, p. 297; 26 Am.Jur., *Husband and Wife* § 277, p. 884.

Directing our attention to the circumstances, if any, in which antenuptial agreements may be rescinded, we discover our Supreme Court recognized in an early case the difficulties inherent in finding such rescission. The problem is presented in *Mallow v. Eastes*, (1913) 179 Ind. 267, 100 N.E. 836. In that case Henry Mallow (Henry) and Lavina Mallow (Lavina) entered into an antenuptial agreement. The agreement provided in pertinent part that upon the death of either party the survivor was to have no statutory interest in the property of the decedent. Henry promised to provide Lavina with a life estate in certain

---

**6.** It appears to us that both parties assume it was to Mae's benefit to take under the antenuptial agreement, if not rescinded, rather than under the will. Therefore, Mae's Estate did not appeal that portion of the trial court's judgment ordering the antenuptial agreement to be enforced by its terms and implicitly denying it the right to take under the will; Mae's Estate consequently waived this issue.

**7.** We address the merits despite a claim of waiver by Charles' Estate. Mae's Estate technically failed to comply with Ind.Rules of Procedure, Appellate Rule 8.3(A)(7) in that it did not set forth in its brief the specific error assigned in the motion to correct errors to which its argument was addressed. Obviously as evidenced by its brief, Charles' Estate was able to respond without undue hardship. Moreover, we had no difficulty in understanding Mae's Estate's arguments. Consequently, waiver is not mandated. *See Dahlberg v. Ogle*, (1977) 266 Ind. 524, 364 N.E.2d 1174.

specifically described real estate with the remainder to his children. The parties were married. Two years later Lavina joined Henry in conveying the same real property described in the antenuptial agreement for $1,100, its fair market value.[8] Henry later died intestate, and his children from his first marriage instituted an action against Lavina asking for partition of certain real estate owned by their father at his death. Lavina filed a cross complaint seeking a partition to her of one-third of Henry's land.

Our Supreme Court remanded *Mallow* to allow the fact-finder to determine the circumstances under which Henry and Lavina agreed, orally or in writing, to modify or avoid the antenuptial contract. Lavina contended the jury should have been instructed the antenuptial agreement failed for lack of consideration once she and Henry conveyed away the land. To this the Court responded:

"By the original contract, although executory in form, the equitable and beneficial estate in the subject-matter, the land to be conveyed or devised during life, passed to appellant upon marriage, and in equity she became possessed of the estate to the extent that if the conditions had remained the same, she could have required specific performance. It is impossible that such a contract can be entire as to consideration, because the marriage itself is of the highest consideration, and *by the marriage the contract is partially executed and cannot be rescinded, and the parties placed in status quo*, if the marriage is to be respected, and it is to the public interest and good public policy that it should be; . . . . [emphasis added]."

*Id.* at 275, 100 N.E. at 839. The Court further observed, "the case does not stand in the category of ordinary cases, for the reason that the contract had been partially executed by the marriage and could not be rescinded, . . . ." *Id.* at 277, 100 N.E. at 840. Of course, the conclusion expressed in *Mallow* is in consonance with the princi-

ple that "[a] contract will not be rescinded unless both parties can be restored to their original condition; . . . ." *Kruse, Kruse & Miklosko, Inc. v. Beedy*, (1976) Ind.App., 353 N.E.2d 514, 530 (quoting *Stewart v. Ludwick*, (1867) 29 Ind. 230, 235). In the instant case, as in *Mallow*, such reversion to the status quo is impossible where, subsequent to the antenuptial agreement, the marriage itself has been consummated.

*Mallow* does, however, recognize the "property rights" involved in an antenuptial contract may be altered by the parties' subsequent agreement. But we note there is no evidence bringing the instant case within this principle espoused in *Mallow*. The appropriate test in *Mallow* is whether by "postnuptial *agreement*" the parties have changed such property rights acting with "an honest purpose, and some valuable consideration" to support the postnuptial agreement. *Mallow v. Eastes, supra*, 179 Ind. at 273, 100 N.E. at 838. There is no suggestion of such agreement in the instant case; indeed, Mae's Estate in essence concedes this aspect of *Mallow* is inapplicable, by observing "there have been no assertions of modification nor any waivers of performance, nor ratification of Charles' actions; but simply, the parties have simply gone their own ways and totally abandoned the agreement constituting rescission." We conclude under *Mallow v. Eastes, supra*, rescission may not be effected through joint abandonment in the manner described by Mae's Estate.

*Mallow* further speculates, in dicta, that had the wife not joined in conveying the property which she was to receive under the antenuptial agreement, "it might be that the husband, by putting it beyond his power to carry out his contract, had so far abrogated the contract as to let the wife in to share in his estate, even though he left sufficient estate . . . for the reason that it might not have been sufficient to relegate her to the condition of a creditor of

---

8. Evidence revealed Henry received the proceeds.

his estate." [9] *Mallow v. Eastes, supra* at 273, 100 N.E. at 838. The wife in *Mallow* was to receive a life estate in real property under the antenuptial agreement. In the instant case, even if application of the provisions of Charles' will proved so inequitable as to amount to an "abrogation," there is no evidence Charles had placed his estate in a position where it could not provide, or Mae's Estate could not adequately recover, the "entire net income" specified in the antenuptial contract.

Nor do we believe the principle of "abrogation" alluded to by the Court in *Mallow*, assuming *arguendo* it can be fairly taken to be argued by Mae's Estate, is applicable to the acts of Charles.[10] In *Mallow* the Court anticipates a situation in which an abrogating party takes action "putting it beyond his power to carry out his contract," thereby in effect "virtually renounc[ing]" the contract. *Mallow v. Eastes, supra* at 273, 276, 100 N.E. at 838, 840. Essentially the question becomes in such cases whether or not there was a "substantial" breach of the contract,[11] and whether the breach went to a "material and vital" condition of the contract. See *Cantor v. Cantor*, (1959) Ohio Probate, 174 N.E.2d 304; *and see* 17 Am. Jur.2d *Contracts* § 504 at 981, where it is stated,

"[t]he general rule is that a contract may be rescinded for substantial nonperformance or breach, and ordinarily a material breach warrants rescission if there is a failure to perform a substantial part of the contract or one or more of its essential terms or condition, or if there is such breach of a contract as substantially defeats its purpose."

In *Cantor v. Cantor, supra*, the husband and wife entered into an antenuptial agreement which provided the husband was to leave the wife $15,000. He died intestate. The court decided the wife was entitled to receive $15,000 from his estate and discussed whether she could rescind the contract because the husband, in apparent contradiction of the earlier agreement, failed to leave a will. The Court in *Cantor* concluded the evidence did not show the husband intended to rescind the contract, nor was the breach substantial enough to allow the wife to do so. *Id.* at 314. In arriving at its decision, the Court observed that

" '[o]rdinarily, the right to claim a discharge of the whole contract depends, not on whether the act constituting the breach was inconsistent with the terms of the contract, but upon whether it was inconsistent with an intention to be further bound by its terms or upon whether the breach was such as to defeat the purpose of the contract.' "

*Id.* at 314, *quoting* 12 Am.Jur. *Contracts*, § 343 at 901. As in *Mallow v. Eastes, supra*, the Court emphasized that the marriage had been fully performed by both parties and concluded that in light of such fact "to permit Faye Cantor to overthrow

---

**9.** We further observe the Court considered elsewhere in its opinion that "[i]f the decedent had conveyed the property, the wife not joining, to an innocent purchaser for value, the husband would by his act have rendered performance impossible, and virtually renounced it, so that the wife might be let in, as in case of ordinary contract, to claim damages." *Mallow v. Eastes, supra* at 840.

**10.** We are principally concerned here with Charles's execution of a will which conflicted with the literal terms of the antenuptial agreement. We do not agree with Mae's estate that its argument is further supported by the mere fact the antenuptial agreement was not offered at the time probate of Charles' will was commenced.

**11.** Our courts in dealing with contract cases outside of the antenuptial agreement context

have similarly recognized a principle of substantial breach which produces a rescission in such cases. *See, e. g., Smeekens v. Bertrand*, (1974) 262 Ind. 50, 311 N.E.2d 431, where the Court citing 17 Am.Jur.2d *Contracts* § 504, *supra* and § 502, observes, in the context of a land contract where the vendor covenants to deliver property in return for the vendee's periodic payments, "[i]f the vendor, for one reason or another, wrongfully withholds possession of such premises from a *non-defaulting* vendee, he has failed to supply to the vendee the very thing for which the vendee contracted. [emphasis in original]" *Id.* at 56, 311 N.E.2d at 435. The Court stated there may thus be a rescission where one party "materially breached" a contract so as to produce a "complete failure of consideration." *Id.*

the entire contract would work a fraud upon the marriage." [12] *Id.* at 315.

 In the instant case, as in *Cantor*, it is evident the purpose of the antenuptial agreement, if not its precise terms, was substantially accomplished by Charles' will. By the antenuptial agreement Charles intended to provide for Mae during her life if she survived him. Neither he nor she desired the survivor to have a remainder interest in any property owned by the other. A fair reading of his will shows Charles made suitable provision for Mae from the income of his entire estate if she survived him, and Mae's Estate presents no evidence to show she would have been better off under the antenuptial agreement. Charles did not in his will leave Mae a remainder interest in any of his property. Further, Mae's Estate failed to provide any evidence there was a breach of any of the other provisions of the agreement. During the lengthy marriage of the parties the terms of the antenuptial agreement were substantially effectuated and the breach alleged herein of minor significance and easily remedied. We therefore conclude the trial court fully respected both Charles' and Mae's rights under the contract by preserving his rights to dispose of the property after Mae's death, and by enabling Mae to enforce the provisions of support during her lifetime.

We affirm.

YOUNG and SHIELDS (by designation), JJ., concurs.

---

12. In deciding the husband had "fairly performed" his contract, the Court in *Cantor* distinguished the facts of several cases in which there was a substantial breach. See, e. g., *Becker v. Becker*, (1909) 241 Ill. 423, 89 N.E. 737 (husband completely failed to perform promise to maintain insurance on his life in return for the promise he would receive his wife's entire estate); and *Eaton v. Eaton* (1919) 233 Mass. 351, 124 N.E. 37 (husband depleted his estate through inter vivos gifts to his sons before his death for the express purpose of diminishing the estate provided to his wife).