SHIRLEY DUBIN *et al.*, Co-executors of the Estate of Ann Wise, Deceased, *et al.*, Plaintiffs-Appellees, Cross-Appellants, *v.* HARVEY R. WISE *et al.*, Defendants-Appellants, Cross-Appellees.

First District (2nd Division)    No. 61584

Opinion filed June 22, 1976.—Rehearing denied September 27, 1976.

134

Jay A. Canel and James H. Canel, both of Chicago (Canel & Canel, of counsel), for appellants.

Edward S. Silber, Dennis M. Wilson, and Larry Selander, all of Chicago (Price, Cushman, Keck, Mahin & Cate, of counsel), for appellees.

Mr. JUSTICE HAYES delivered the opinion of the court:

On 20 December 1935, Harry H. Wise and Anna Tuckman entered into an antenuptial agreement. Both had been married previously; and, during their respective prior marriages, both had children who were still living. The pertinent paragraph of this antenuptial agreement provided:

> " IT IS AGREED that the said HARRY H. WISE will, by will or other testamentary disposition, cause to be delivered or conveyed to the said ANN TUCKMAN, upon the death of the said HARRY H. WISE, one-fourth (¼) of all the property possessed by the said HARRY H. WISE, whether real, personal or mixed, for and in consideration of the marriage hereinafter contemplated * * *."

This quarter share was in lieu of any marital interest Anna Tuckman (who was known as Ann Wise after the marriage) might have in the estate of Harry Wise. (The precise language of this provision in the antenuptial agreement is set out later in this opinion.) Harry Wise died on 1 July 1971, predeceasing Ann Wise by about a month. He left a will which provided *inter alia:*

> "Third: I desire that there be paid to my wife, ANN WISE, a sum equal to one-fourth of the value of my entire estate, as provided in an ante-nuptial agreement. Such payment shall be in lieu of dower, widow's award, or any other right or interest my said wife may have had at the time of my death had no ante-nuptial agreement been entered into prior to our marriage."

During his life, Harry Wise owned beneficial interests in certain Illinois land trusts, certificates of deposit, and a one-third partnership interest in Harry H. Wise & Sons, a real estate management business. The land trusts under which Harry Wise personally owned a beneficial interest provided that Ann Wise was to receive 25% of Harry Wise's beneficial interest when he died. In December of 1970, Harry Wise caused all of the above mentioned property to be transferred donatively to his sons Harvey R. Wise and Seymour Wise. As to the beneficial interests under the land trusts, Harvey Wise is then alleged to have exercised his power of direction so as to eliminate the trust provision which gave 25% of the said interest to Ann Wise on the death of Harry Wise. As a result of these donative transfers, therefore, Ann Wise's quarter interest in Harry's property at his death was substantially smaller than it would otherwise have been.

Shirley Dubin, as co-executor of the estate of Ann Wise, deceased, and as administrator with the will annexed of the estate of Harry Wise, deceased, and individually, together with Muriel Tuckman, as co-executor of the estate of Ann Wise, deceased, and individually, initiated the present litigation against Harvey R. Wise and Seymour Wise. Both Shirley Dubin and Muriel Tuckman (hereinafter plaintiffs) are daughters of Ann Wise.

In the five-count complaint in chancery, plaintiffs first alleged that defendants unduly influenced Harry Wise to transfer his property to defendants in derogation of Ann Wise's right under the antenuptial agreement and prayed that defendants be required to return to the Harry Wise Estate the assets Harry Wise transferred to defendants.

Count II alleged that Harry Wise's inter vivos donative transfers of property to his sons in December of 1970 were so unreasonable in amount as to be in fraud of his antenuptial agreement with Ann Wise; that defendants were aware of the antenuptial agreement and that they were aware that Harry Wise's transfers to them would minimize Ann Wise's right under the antenuptial agreement. Count II prayed that the assets be returned to the estate of Harry Wise.

Count III in large part repeated Count II and further alleged that Harry Wise became Ann Wise's constructive trustee as to 25% of his assets as a result of the antenuptial agreement. Plaintiffs then alleged that Harry Wise recognized his obligations by drafting his will as he did, and that defendants were aware of the constructive trust and fiduciary duties of Harry Wise. Count III prayed that the transfers be set aside or impressed with a constructive trust, and that an accounting be made to plaintiffs by defendants.

Count IV alleged that no accounting has been made as to Harry Wise's partnership interest in Harry H. Wise & Sons, and that Ann Wise, as an heir of Harry Wise, and now her estate, was entitled to an accounting. Count IV prayed for an accounting for the partnership interest from its inception.

Finally, Count V alleged that, pursuant to a power of direction granted to Harvey Wise, Ann Wise's contingent beneficial interest in a land trust was cut off in breach of Harvey R. Wise's fiduciary duty toward her. Count V prayed for the setting aside of this power of direction and for an accounting.

Defendants' answer denied all the material allegations of plaintiffs' complaint and alleged as an affirmative defense that plaintiffs had no standing to sue.

After a trial before Judge Walter Dahl, the court found that Harry Wise's transfers of property to defendants in December of 1970 were "made knowingly and deliberately" and were "contrary to the duties

owed by Harry Wise to Ann Wise" under the antenuptial agreement. These transfers were found to have been unreasonable in amount relative to the total value of the estate of Harry H. Wise. Plaintiffs were held to have standing to prosecute this action. Therefore, the court ordered defendants: (1) to transfer one-fourth of the cash represented by the certificates of deposit which Harry Wise had transferred to defendants; (2) one-fourth of Harry Wise's land trust beneficial interests with an accounting therefor; and (3) one-fourth of the value of the partnership interest Harry Wise transferred to defendants, with an accounting therefor from and after 14 December 1970 (the date on which the court held the partnership had been terminated).

Defendants appealed and plaintiffs cross-appealed from this order.

On appeal, defendants make three principal contentions. First, they maintain that Harry Wise did not breach the antenuptial agreement because he had the absolute right to make the inter vivos donative transfers of his property to his sons and because his will had in fact left one-fourth of his property to Ann Wise. Secondly, defendants maintain that, even if Harry Wise did breach the antenuptial agreement, nevertheless, since Ann Wise had, during the lifetimes of Harry and herself, filed a homestead declaration relative to their marital residence in California (owned by Harry Wise), she had herself first breached the antenuptial agreement and had thereby excused any performance by Harry. Defendants characterize the said action of Ann Wise as a breach of a condition precedent to performance by Harry Wise. Finally, the defendants maintain that the evidence was not so clear and convincing as to permit the imposition of a constructive trust upon them as to the property which had been transferred to them by Harry in December of 1970.

Plaintiffs on their cross-appeal contend that they are entitled to an accounting of Harry Wise's partnership interest from the date of the partnership's inception, since the record did not support the trial court's finding that annual accounts had been made between the parties until the termination of the partnership in December of 1970. Secondly, plaintiffs contend that the evidence fails to establish that Harry Wise's transfers were not the result of undue influence. More precisely and more persuasively stated, this contention may be construed as a contention that their evidence had created a presumption of undue influence which defendants had failed to rebut.

## OPINION

The first issue is whether decedent breached the antenuptial agreement by his inter vivos donative transfers of assets to defendants in December of 1970. This depends on whether he had the claimed absolute right to

transfer his property to his sons, inter vivos, despite having entered into the antenuptial agreement with his then prospective wife to leave one quarter of his property to her by will or other testamentary disposition.

In an opinion filed on June 4, 1976 *(Toman v. Svoboda* (1976), 39 Ill. App. 3d 394, 349 N.E.2d 668), this Division of this court had occasion to consider the right of a donor-spouse to make real inter vivos donative transfers of his or her own property, during the lifetime of both spouses, to persons other than the other spouse insofar as those transfers operated to defeat what would otherwise have been the statutory marital right of the other spouse, who proved to be the surviving spouse. In the course of that opinion, we said: "[T]he statutory marital right (unlike certain *contractual* rights of a surviving spouse) [does not] impose any duty on the owner spouse to deal with his or her property during the lifetime of both spouses in what might be regarded as a normal or reasonable course of dealing with one's own property, either as to all or as to a disproportionate share of that property."

■■ In the instant case, plaintiffs seek to vindicate, not the statutory marital right of Ann Wise as the surviving spouse, but rather the vested contractual right of Ann Wise under the antenuptial agreement. In *Bergmann v. Foreman State Trust & Savings Bank* (1934), 273 Ill. App. 408, this court rejected the contention that an antenuptial agreement of the instant type prevents the obligor from making *any* inter vivos donative transfers of his own property. But this court held, nevertheless, that such an agreement limits the right to make such transfers. The court stated that "Where a man has entered into an antenuptial agreement with a woman who becomes his wife to give her a proportional part of his estate, he may make gifts during his life without breaking the agreement if the gifts are made in good faith and are reasonable in amount." (273 Ill. App. 408, 412.) The court stated further that "If the decedent had given away property [inter vivos] with furtive intent, for the purpose of defeating the antenuptial contract and [he defrauded] the plaintiff, the gift would [be] void." 273 Ill. App. 408, 413,

Hence, it appears that two independent grounds exist upon either of which the promisee, under the antenuptial agreement with the promisor to leave the promisee, by will or other testamentary disposition, a specified fractional share of the promisor's estate, may attack real inter vivos donative transfers by the promisor: (1) fraud in fact based upon the existence of an actual intent thereby to subvert the antenuptial agreement; and (2) fraud implied in law from transfers of a disproportionate and unreasonable amount of assets in relationship to the balance of the promisor's property. In our view, either type of fraud upon the contractual right of the promisee is a breach by the promisor of an implied term of the antenuptial agreement, namely, that the promisor will

138

deal with his or her own property in good faith. In the instant case, the trial court found that both types of fraud upon the contractual right of Ann Wise existed and accordingly ruled for the plaintiffs.

Defendants rely strenuously on *In re Estate of Spindler* (1934), 277 Ill. App. 397. There decedent and his prospective wife entered into a detailed antenuptial agreement whereby decedent promised to make a will leaving his prospective wife a legacy of $50,000. He did in fact do so. Unfortunately for Mrs. Spindler, after the marriage but before Mr. Spindler's death, he guaranteed an indebtedness of a company, in the amount of $148,000, to an insurance company. The insurance company called on him to perform on his guaranty. As a result, Spindler's estate at his death was insolvent.

The court held that the contract to leave a legacy of $50,000 could not be construed to be a promise to pay $50,000. Hence, the court held that Mr. Spindler fully performed by executing a will leaving a legacy of $50,000 to his wife.

The *Spindler* case is distinguishable from the instant case in at least two significant respects: (1) the recipient of the guaranty funds was not a donee but rather an assured under the guaranty arrangement; and (2) no challenge was made as to the good faith of Mr. Spindler in guaranteeing the $148,000 indebtedness.

In *Bruce v. Moon* (1900), 57 S.C. 60, 73-74, 35 S.E. 415, 419, the court stated:

"To say that a person has fulfilled his agreement to give to another all of his property at his death * * * and then [turns] right around and annul[s] and effectually destroy[s] such testamentary provision by conveying away all of his property to another, leaving nothing whatever upon which the will would operate, would be but 'keeping the word of promise to the ear and breaking it to the hope.'"

We agree. Compliance with the literal terms of the antenuptial agreement in form but not in substance breaches the implied term of good faith present in such contracts by permitting precisely what the parties sought to prevent. See *In re Estate of Chayka* (1970), 47 Wis. 2d 102, 176 N.W.2d 561.

In order to affirm the trial court on this issue, we need not and do not reach the matter of whether the evidence supports the finding of the trial court that Harry Wise, in making the real transfer of assets to defendants in December of 1970, actually had the co-intent thereby to subvert the antenuptial agreement. It suffices that the evidence supports the trial court's finding that the assets transferred were in an amount which was disproportionate and unreasonable in relation to the balance of Harry's property, so that the transfers constituted a fraud implied in law on the

contractual right of Ann Wise and were therefore voidable by the estate of Ann Wise to the extent required to enforce her said contractual right, together with an accounting to insure that the contractual right has been properly complied with. We hold that the allegations of Count II of the complaint were proved.[1]

Defendants' second contention on this appeal is that Ann Wise herself first breached the antenuptial agreement by recording, during the lifetimes of the spouses, a homestead declaration as to their marital residence in California, and that her said breach excused performance of the agreement by Harry Wise, or, as defendants put it, her recording breached a condition precedent to any performance by Harry Wise. Defendants cite *Becker v. Becker* (1909), 241 Ill. 423, 89 N.E. 737. Plaintiffs respond that Ann Wise's recording of the homestead declaration was at most a breach of an independent covenant in the antenuptial agreement and not a breach of a condition precedent to performance by Harry Wise of his obligations under the antenuptial agreement. Plaintiffs cite *Foreman State Trust & Savings Bank v. Tauber* (1932), 348 Ill. 280, 180 N.E. 827.

Our scrutiny of the relevant provision of the antenuptial agreement (set out just below) leads us to disagree with the basic theory of both parties that the mere recording of the homestead declaration by Ann Wise constituted a breach by her of the antenuptial agreement. On the part of Harry Wise, the consideration given for the antenuptial agreement was his promise to leave Ann, by will or other testamentary disposition, 25% of his estate at his death, and the undertaking to forego any and all marital rights in her property. On the part of Ann Wise, the consideration given was the marriage and the mutual undertaking to forego any and all marital rights in his property. The provision in the antenuptial agreement relevant to the mutual undertaking to forego any and all marital rights in the property of the other is worded as follows:

"[T]he parties do hereby waive, discharge and quit claim unto the other party to this contract his or her heirs, assigns, or next-of-kin, all right, title or interest that he or she may acquire, by virtue of said marriage, in any of the estate of the other party, whether real, personal or mixed, including the right of homestead or dower interest. * * * "

Read literally, the provision contemplates that, for some reason, the survivor may acquire a marital right, including the right of homestead, in the property of the first to die. Each party, therefore, *hereby* waives,

---

[1] We note in passing that this holding is in accord with the weight of authority over a period in excess of 250 years. *Gregor v. Kemp* (1722), 3 Swanst. Rep. 404, note 36 Eng. Rep. 926; *Dickenson v. Seaman* (1908), 193 N.Y. 18, 85 N.E. 818; *Eaton v. Eaton* (1919), 233 Mass. 351, 124 N.E. 37, 5 A.L.R. 1426.

discharges, and quitclaims any and all such acquired marital rights, either to the other party or to his or her heirs, assigns, or next of kin. The provision appears to be intended to operate, as between the parties, as a self-executing implementation of the mutual undertaking to forego any and all marital rights in the property of the other.

■■ Hence, no breach of the antenuptial agreement would occur by the mere acquisition by Ann Wise of the marital right of homestead, whether the said acquisition under California law, occurred at the time of recording the homestead declaration or only later upon the death of Harry leaving Ann surviving.[2] Under the terms of the antenuptial agreement and as between the parties, the acquired right would automatically be quitclaimed to the appropriate transferee. It follows that, in order to establish a breach of the mutual undertaking, there would have to be some manifestation of a refusal to quitclaim the right of homestead after it had been acquired. Since both parties focused solely on the mere recording of the homestead declaration as constituting a breach of the antenuptial agreement (a position with which we disagree), neither party paid any attention to the matter of a later manifestation of a refusal by Ann to quitclaim the said right, which manifestation, in our view, would be necessary to establish a breach of the relevant provision of the antenuptial agreement. We conclude that no breach was established by proof of Ann's mere recording of the homestead declaration, nor was any breach otherwise established, so that defendants' second contention on this appeal has no merit.

Finally, defendants contend that the findings of the trial court were not supported by clear and convincing evidence so as to justify the imposition of a constructive trust upon them as to the assets which Harry Wise had donatively transferred to them in December of 1970.

Plaintiffs' complaint creates a degree of confusion as to this final contention of defendants which needs to be dissipated. Count III of plaintiffs' complaint alleges that the type of antenuptial agreement herein involved operated to make Harry Wise a constructive trustee of his own property for the benefit of Ann during the lifetimes of the parties. We know of no authority which supports that proposition, and the trial court made no such finding. Count V of plaintiffs' complaint alleged that Harvey Wise, after the donative transfer to himself and Seymour, of Harry's beneficial interests under the land trusts and after the vesting in Harvey of the power of direction thereunder, sustained a fiduciary relationship with Ann Wise as to her contractual right to 25% of the said beneficial interests after the death of Harry. The only basis we can see for this allegation is that the type of antenuptial agreement herein involved

---

[2] Neither of the parties to the instant suit saw fit to enlighten this court as to the legal characteristics of the right of homestead under California law.

operated to create a fiduciary relationship between Harry and Ann during the lifetimes of both, with Harry as the dominant and Ann as the subdominant party; upon the donative transfer of Harry's beneficial interests under the land trusts and upon the vesting of the power of direction in Harvey, Harvey replaced Harry as the dominant party in a fiduciary relationship with Ann. We know of no authority in support of the proposition that an antenuptial agreement of the type herein involved operates to create a fiduciary relationship between the parties to the agreement during the lifetimes of both parties, and the trial court made no such finding. We conclude that Counts III and V of plaintiffs' complaint are legally insupportable.

■■ What the trial court found was that the donative transfers of December, 1970, involved such an unreasonable and disproportionate share of Harry's assets as to make those transfers a breach of the duties owed by Harry to Ann under the antenuptial agreement. More fully articulated, the transfers were in breach of an implied term of that agreement that Harry, during the lifetimes of the parties, would deal with his own property in good faith; the transfers of such an unreasonable and disproportionate share of Harry's assets constituted a fraud implied in law upon the vested contractual right of Ann under the agreement, and the donee-transferees held the property as constructive trustees for the benefit of Ann to the extent of her contractual right in the said property. Those findings sustained Count II of plaintiffs' complaint. We think the findings were supported by clear and convincing evidence. As we observed above, there is no need for us to consider, nor do we do so, the further finding that Harry made the said transfers with the actual co-intent thereby to subvert Ann's contractual right, so that the transfers were also fraudulent in fact. Finally, we note that the remedies sought in Counts III and V are available to plaintiffs under Count II and its rationale, but not under the rationale pleaded in either Count III or Count V.

■■ On their cross-appeal, plaintiffs first contend that they have a right to an accounting by defendants of the one-third partnership interest of Harry Wise, both as to partnership distributions and as to partnership capital assets, not merely as of and after 14 December 1970 but from the date of the inception of the partnership, on the ground that there had never been any accounting by and among the partners. The trial court found that there had been informal annual accounts as to partnership distributions from the inception of the partnership to 14 December 1970, and that Harry Wise had received his proper share of such distributions. Both Harvey and Seymour Wise so testified. There is no evidence that Harry Wise ever complained as to the accuracy of those partnership distributions. On that state of the record, we cannot say that the trial court's finding is against the manifest weight of the evidence.

As to partnership capital assets, there was no evidence of any accounting either from inception to 14 December 1970 or on 14 December 1970. Hence, there was no proof that there had ever been any accounting of partnership capital assets from the inception of the partnership until Harry transferred his one-third partnership interest to his two co-partners and sons on 14 December 1970.

We examine in greater detail what the three partners did on that date. Harvey Wise testified that the partnership capital assets consisted of bank savings accounts carried in the names of all three partners and of the beneficial interest under certain land trusts, also carried in the names of all three partners.[3] On 14 December 1970, pursuant to advice of counsel and with all three partners present, the three removed Harry's name from the bank accounts and from the land trust agreements. Harvey described this action by all three partners as a "termination" of the partnership, and the trial court found that the partnership had been "terminated" on 14 December 1970. In effect, therefore, Harry had conveyed his one-third partnership interest to his two co-partner sons, and he had not demanded any accounting of the partnership assets as of that date; whatever they were, it was his intent to convey his one-third partnership interest therein to his co-partner sons. We do not think it is material whether the action of the three partners on 14 December 1970 constituted a "termination" of the partnership or simply a dissolution; under the circumstances, no winding up was contemplated. Indeed, since the two sons merely continued as partners, the action might as accurately be described as a withdrawal by Harry from the partnership, accomplished by Harry's transfer of whatever his one-third partnership interest might be to his two co-partner sons.

■■ We have already held that this donative transfer by Harry of his one-third partnership interest to his two co-partner sons, plus the other contemporaneous donative transfers of his assets to his sons, constituted a donative transfer of an unreasonable and disproportionate share of his property to them and thereby breached the implied term of the antenuptial agreement that he would during his lifetime deal with his own property in good faith, and worked a fraud implied in law upon the vested contractual right of Ann under the antenuptial agreement. As a result, the sons held the property, including the one-third partnership interest, as constructive trustees for the benefit of Ann to the extent of her 25% share of such property. As constructive trustees of the transferred one-third partnership interest, defendants immediately became subject to a duty to account to *Ann* (and now to plaintiffs as co-executors of Ann's

---

[3] There was testimony, however, that the beneficial interest under one land trust was carried in the sole name of Harry, although the interest was a partnership asset. What was done as to this beneficial interest can be determined in an accounting of the partnership assets as of 14 December 1970.

estate) as to partnership capital assets as of 14 December 1970 and as to subsequent partnership distributions, so as to insure that Ann's estate will receive her proper 25% share of that one-third partnership interest. This was the order of the trial court in respect of the accounting for the one-third partnership interest, and we hereby affirm it for the reason here stated.

It is important to note that this right to such an accounting as to the one-third partnership interest exists in plaintiffs as co-executors of Ann's estate because the said right accrued to Ann on 14 December 1970 as the beneficiary of a constructive trust; on her death some seven or eight months later, the right passed to plaintiffs as co-executors of her estate. Since the estate is still being probated, obviously there has been no final distribution of the personal property of the estate, so that plaintiffs individually, whether as legatees or heirs of Ann, have no *personal* right to the said accounting.

There remains for consideration the claim of Shirley Dubin, as administrator with the will annexed of the estate of Harry Wise, decedent, to an accounting as to the partnership capital assets from the inception of the partnership to 14 December 1970 and as of that date. When Harry Wise died on 1 July 1971, he was not a partner and had not been for 6½ months. This is not a case, therefore, in which the partnership was dissolved by the death of one partner, in which event, under section 43 of the Uniform Partnership Act (Ill. Rev. Stat. 1971, ch. 106½, par. 43), the surviving partners have a duty to account to the legal representative of the deceased partner for the partnership interest of the decedent. We are aware that the failure of the deceased partner to demand a formal partnership accounting while the partnership exists (pursuant to section 22 of the Uniform Partnership Act, Ill. Rev. Stat. 1971, ch. 106½, par. 22) does not constitute any laches on his part *(Korziuk v. Korziuk* (1958), 13 Ill. 2d 238, 148 N.E.2d 727), and that, in any event, the right to the dissolution accounting under section 43 does not accrue until the dissolution occurs *(Englestein v. Mackie* (1962), 35 Ill. App. 2d 276, 182 N.E.2d 351). When the dissolution occurs by reason of the death of a partner, the right to the dissolution accounting accrues to the legal representative of the deceased partner, and the deceased partner could not conceivably waive a right which never accrued to him personally.

Section 43, however, also provides that, when a partnership is dissolved for a reason other than the death of a partner, a former partner has a right to a dissolution accounting against the winding up partner or partners. Defendants contend that, since the trial court found that the instant partnership was "terminated" rather than dissolved on 14 December 1970, section 43 is inapplicable. The real thrust of the contention is that, under the circumstances and by the intent of all three partners, no winding up

was here contemplated. In effect, Harry simply withdrew as a partner by transferring his one-third partnership interest, whatever it might have been, to his other two partners who would continue the partnership as between themselves. Hence, no accounting was contemplated and none was demanded by Harry. Under the instant circumstances, we think there is merit to this contention.

■■ But even if we assume that the proper categorization of what happened on 14 December 1970 was that the partnership was dissolved rather than terminated with the result that, under section 43, the right to a dissolution accounting accrued to Harry, we think that Harry's conduct on and after 14 December 1970 and his failure to demand a dissolution accounting during the remaining 6½ months of his life, constituted a knowing and voluntary waiver of his right to a dissolution accounting, which waiver is binding on Shirley Dubin as his legal representative. We hold, therefore, that Shirley Dubin, as administrator with the will annexed of the estate of Harry Wise, decedent, has no right to an accounting of the partnership capital assets either from the inception of the partnership to 14 December 1970 or as of 14 December 1970.

Plaintiffs' second contention on their cross-appeal is that the evidence adduced by defendants did not establish that the inter vivos donative transfers of assets by Harry Wise to defendants were not the result of undue influence exerted by defendants (and especially by Harvey Wise) on Harry. The reference is to Count I of plaintiffs' complaint in which plaintiffs allege that the transfers were the result of such undue influence. Shirley Dubin, as administrator with the will annexed of the estate of Harry Wise, decedent, had standing to raise this issue. The trial court found that, as to Count I, plaintiffs had failed to sustain their burden of proof. In order to make sense of plaintiffs' second contention, it must be construed as a contention that the evidence adduced by plaintiffs created a presumption of undue influence which defendants then failed successfully to rebut.

■■ There is no question but that the inter vivos transfers by Harry of his own property to his sons in December of 1970 conferred a substantial benefit upon them. The only question is whether plaintiffs' evidence established that, at the time of those transfers, a fiduciary relationship existed between the parties in which the sons (and especially Harvey) were the dominant parties and Harry was the subdominant party. If so, a presumption of undue influence arises from the inter vivos donative transfers by the subdominant to the dominant party which conferred a substantial benefit on the dominant party. (*Krieg v. Felgner* (1948), 400 Ill. 113, 121, 79 N.E.2d 60.) Such a relationship between parent and child must be proved by clear and convincing evidence in order to justify setting aside the said transfers. (*Stewart v. Sunagel* (1946), 394 Ill. 209, 68 N.E.2d 268; *Stenwall v. Bergstrom* (1950), 405 Ill. 281, 90 N.E.2d 778.)

The mere familial relationship does not of itself create any such fiduciary relationship as a matter of law *(Brown v. Moore* (1950), 407 Ill. 618, 95 N.E.2d 856) or any presumption of undue influence *(Clow v. Chicago Title & Trust Co.* (1972), 9 Ill. App. 3d 168, 292 N.E.2d 44).

As to Harry's one-third partnership interest, partners, of course, sustain a fiduciary relationship as a matter of law *(cf. Bakalis v. Bressler* (1953), 1 Ill. 2d 72, 115 N.E.2d 323), but, in order to create a presumption of undue influence in respect of donative inter vivos transfers of partnership interests between themselves, the benefiting partner must be proved to be the dominant partner. *(Bandringa v. Bandringa* (1960), 20 Ill. 2d 167, 170 N.E.2d 116.) The precise issue, therefore, is whether plaintiffs' evidence proved clearly and convincingly that, in December of 1970, Harvey dominated Harry either as a dominant child over a subdominant parent or as a dominant partner over a subdominant partner or both.

■■ There is no question that Harry was both the dominant parent and the dominant partner until he moved his residence to California in the 1960s, leaving the day-to-day conduct of partnership business to Harvey, who became the managing partner. The managing partner, however, is not necessarily the dominant partner. Thereafter, with respect to his business affairs involving his nonpartnership assets, there is no clear or convincing evidence that Harry placed any trust or reliance in the judgment of Harvey so as to become a subdominant parent. There was evidence that, in the late 1960s, his health began to fail, he took less and less interest in the partnership business, and his marital relationship with Ann deteriorated. On the other hand, he continued to receive partnership distributions from Harvey, and Harvey testified that, far from becoming a subdominant partner, he became generally harder to get along with. This evidence negates subdominance. Specifically, in December of 1970, the evidence of the sons, if believed, shows that, in making the inter vivos donative transfers to them, Harry had the benefit of independent advice of counsel and was in control of the said transfers. We conclude that the evidence did not clearly and convincingly establish that Harvey dominated Harry, either in the parent-child relationship or in the partner relationship. Hence, no presumption of undue influence was created which had to be rebutted by defendants, and the trial court correctly found that plaintiffs had failed to sustain their burden of proof as to Count I of their complaint.

We have carefully scrutinized the judgment order of the trial court, including the accountings therein required, and, for the reasons set out herein, we affirm the said order.

Affirmed.

STAMOS, P. J., and DOWNING, J., concur.