**Mildred C. RUSSELL, Plaintiff-Appellant,**

v.

**Ronald J. WALZ, Rita M. Walz, Mark G. Kuehling, Rudy E. Walz, Norbert A. Walz, Edwin J. Walz***, **and Roy E. Walz, Defendants-Appellees.**

No. 3–1182A306.

Court of Appeals of Indiana, Third District.

Jan. 26, 1984.

---

---

* Erwin J. Walz is erroneously designated as Edwin J. Walz on all the pleadings and in all the briefs on this action.

Vincent J. Heiny, Snouffer, Haller & Colvin, Fort Wayne, for plaintiff-appellant.

John H. Logan, Fort Wayne, for defendants-appellees.

GARRARD, Judge.

This appeal results from an action brought to recover $20,000 paid as earnest money under an agreement to purchase a farm in Allen County.

On June 25, 1981 Mildred Russell entered into a real estate purchase agreement with the seven adult children of Anton J. Walz. The agreement was for the purchase of a ninety-acre farm on Coldwater Road in Allen County. The farm is referred to herein as the Coldwater Farm. Anton J. Walz and his wife Josephine Walz acquired the land in 1959. Josephine died in 1960, leaving Anton the sole titleholder to Coldwater Farm. In 1973 Anton J. Walz entered into an antenuptial agreement with Dorothy R. Bregenzer, who would become his second wife. The agreement contained two provisions of significance for the present action:

"WIFE RIGHTS IN HUSBAND'S ESTATE

2. In the event of the death of Husband during the said marriage relations Wife surviving him, then the Wife shall receive from the estate of Husband one-third (⅓) of the net estate of Husband to be in full for all claims and demands of every kind and character which the Wife shall have against the estate of Husband. DURING MARRIAGE EACH TO HAVE FULL CONTROL OF OWN PROPERTY

3. During the continuance of said marriage relations, each of the parties is

to have the full right to own, control, and dispose of his or her separate property the same as if the marriage relations did not exist, and each of the parties is to have full right to dispose of and sell any and all real or personal property now or hereafter owned by each of them without the other party joining, and said transfer by either of the parties to this contract shall convey the same title that said transfer would convey had the marriage relations not existed. This contract limits the right of either party to participate in the estate of the other, whether the marriage relation is determined by death or legal proceedings."

Although Walz owned other property, he resided on Coldwater Farm. On October 12, 1979 Walz deeded a one seventy-fifth interest in the farm to each of his seven children. On January 14, 1980 Walz repeated this action, giving each child a second one seventy-fifth interest in Coldwater Farm. On July 5, 1980 Walz deeded to each of his seven children a one-seventh interest in "all of my right, title and interest in" Coldwater Farm. The occasion for this action seems to have been Walz' physical condition: He pre-signed the deed while in the Mayo Clinic under some apprehension of death.

On July 31, 1980 Anton Walz and Dorothy Bregenzer Walz met with attorney Douglas R. Miller. The meeting was at Mrs. Walz' institution. According to Miller's testimony at the trial in this action, Dorothy Walz was concerned about her husband's transfer of his entire interest in Coldwater Farm to his children. Dorothy Walz' concern was that Anton would give away all of his property leaving nothing to pass under the antenuptial agreement. Miller testified that Dorothy and Anton Walz arrived at a compromise, averting Dorothy's intimation of a divorce in the absence of such a resolution. The compromise involved a second farm, herein referred to as the Noble County farm. Working with the two Walzes, Miller prepared an escrow letter and warranty deed. The deed was to convey a one-third interest in Anton Walz' Noble County farm to Dorothy Walz. The documents were left in escrow with Miller to be delivered to Dorothy Walz "upon the first of the following two events to occur: written authorization from [Anton Walz'] attorney, John Logan, or [Anton Walz'] death." At one point in the July 31, 1980 conversations Anton Walz commented to Miller that although he had transferred his interest in Coldwater Farm to his children, he could continue to live there and to collect the farm rents. Miller testified that he informed Walz that "you might be able to get that, but only if your children are benevolent, because you don't own it anymore and you don't have a right to it." Miller described Walz as visibly surprised by the response. Miller described one other noteworthy occurrence in the July 31, 1980 meeting: Dorothy Walz and Miller were in a conference room discussing her situation before Anton Walz joined them. Miller testified that Dorothy Walz raised the issue of undue influence, asking about whether it might be raised in connection with the Coldwater Farm transfer. Mrs. Walz' familiarity with the term presumably derived from her former career as a legal secretary.

Shortly after this meeting, on August 8, 12 and 13, 1981, four of the Walz children, Ronald Walz, Rita Walz, Roy Walz and Mark Kuehling all executed quit claim deeds to Anton Walz releasing any interest in the Coldwater Farm beyond a two seventy-fifths interest, respectively. On September 5, 1980 Anton Walz signed his last will and testament. Among other things, Walz left all the household goods in his residence at Coldwater Farm to Dorothy Walz, assuming that she survived him. Dorothy Walz was also appointed executrix of the estate. The most immediately significant portion of the document read as follows:

"On October 19, 1973 I entered into a written Antenuptial Contract with Dorothy R. Bregenzer, who has since become my wife, and her name, of course, is now Dorothy R. Walz. In said Antenuptial Contract we provided, among other things, that the one of us to survive the other should receive from the first of us

to die one-third (⅓) of the net estate of the first of us to die, to be in full for all claims and demands of every kind and character which the survivor of us shall have against the estate of the first of us to die.

In order to carry out the intent and purpose of said Antenuptial Contract, in the event of my death during my marriage to said Dorothy R. Walz, I have on July 31, 1980 deposited with Douglas E. Miller, Esq., Attorney at Law, 395 Lincoln Bank Tower, Fort Wayne, Indiana 46802 a Warranty Deed involving an undivided one-third (⅓) interest in my farm in Noble County, Indiana. The legal description of said real estate is as follows:

[description omitted]

Under the terms of said letter of July 31, 1980, to said Douglas E. Miller, Esq., I have authorized said Douglas E. Miller, Esq. to deliver said Deed to my wife, Dorothy R. Walz, upon the first of the following two events to occur: written authorization from my attorney John Logan or my death. My said wife, Dorothy R. Walz and I have both agreed that said delivery of said Deed to Dorothy R. Walz shall be in furtherance of my obligation to her under said Antenuptial Contract of October 19, 1973, and to that end said one-third (⅓) interest of the hereinabove described real estate shall be valued at its fair market value as of the date of delivery of said above Deed to said Dorothy R. Walz and if it equals in value one-third (⅓) of my net estate it shall be in full and complete discharge of my obligation under said written Antenuptial Contract dated October 19, 1973, but in no event shall any portion of my said Coldwater Road farm go to satisfy said obligation."

This instrument then proceeds to describe the Coldwater Farm and Walz' "intent to give said above described farm on Coldwater Road near Fort Wayne, Indiana to my children":

"I have by Warranty Deeds dated October 12, 1979 and recorded October 15, 1979, as Instrument No. 79–31649 and dated January 14, 1980, and recorded January 22, 1980, as Instrument No. 80–01732 in the office of the Recorder of Allen County, Indiana, given 2/75 interest in said farm on Coldwater Road near Fort Wayne, Indiana to each of my said children and by another conveyance, I have vested in my sons Norbert A. Walz, Erwin J. Walz, and Rudy E. Walz all the interest I intend to give them in and to said last above herein described Coldwater Road farm real estate, Fort Wayne, Indiana, and on September 5, 1980 I have deposited with my attorney, John H. Logan, Esq., 910 Lincoln Bank Tower, Fort Wayne, Indiana, 46802 a Warranty Deed covering all the rest of my right, title and interest in and to said above described Coldwater Road farm to my other children, namely, Roy Edward Walz, of Allen County, Indiana, Ronald Joseph Walz of San Diego County, California, Rita Maria Walz, of Cook County, Illinois, and Mark Gerard Walz Kuehling of Cook County, Illinois as equal tenants in common. Under the terms of said letter of September 5, 1980, to said John H. Logan, Esq., I have authorized said John H. Logan, Esq., to deliver said Deed to my said children, Roy Edward Walz, Ronald Joseph Walz, Rita Maria Walz, and Mark Gerard Walz Kuehling upon the first of the following two events to occur: written authorization from my attorney, John H. Logan, Esq., or his associate Bruce N. Stier, Esq., if said John H. Logan is not then alive, or on my death whichever event occurs first."

On January 9, 1981 Anton Walz executed a codicil to his September 5, 1980 will. The codicil revoked the earlier bequest of household goods to Dorothy Walz and revoked her appointment as executrix of Walz' estate. Two of Walz' sons, Norbert A. Walz and Roy Edward Walz, were appointed as co-executors of the estate. Walz died on February 16, 1981. His will and codicil were probated and on March 6, 1981 Norbert Walz and Roy Walz were appointed as co-personal representatives of the Anton Walz Estate. The Coldwater

Farm was appraised, and the estate received two offers to purchase the farm for the sum of $212,000.00. Acting for the estate, Norbert Walz executed an agreement to purchase the farm with Mildred Russell. Russell agreed to pay $212,000.00 for the farm, and deposited $20,000 as earnest money. Closing was to be by September 25, 1981. If Russell could not obtain financing by that date, the price would increase by $13,000.00 and the closing date would be extended until December 24, 1981. The form upon which the agreement was executed contained a section indicating that the "Seller shall furnish at Seller's expense" one of two title options, an option to be selected by marking the box preceding it. The first title option is marked, and reads as follows: "An Abstract of Title disclosing in Seller marketable title to the real estate as of a date after the date hereof. Buyer shall have a reasonable time before closing to have the same examined, and Seller shall have a reasonable time to correct any title defects."

The Walz children had the abstract on Coldwater Farm brought up to date as of July 22, 1981. Russell then had her attorney, Vincent J. Heiny, examine the abstract. On July 28, 1981 Heiny sent Russell a title opinion, a copy of which he forwarded to John Logan, attorney for the Walz children. Heiny's title opinion included the following paragraph:

"The abstract makes reference to the estate of Anton J. Walz. In addition, the abstract discloses a certain letter dated September 5, 1980 to Mr. John H. Logan requesting that a certain deed to three of the present titleholders from Anton J. Walz, the then titleholder of a certain portion of the real estate, be delivered upon the occurrence of certain events, one of which was the death of Anton J. Walz. The said Warranty Deed referred to in this letter was recorded after the death of Anton J. Walz. Due to the testamentary nature of this letter and deed as well as the reference in the Will and Codicil of Anton J. Walz to a certain antenuptial contract with Dorothy R. Walz, I would request that Dorothy R. Walz execute a quit-claim deed to you, that the personal representatives of the estate petition for authority to execute quit-claim or other deed to you as well as the proposed affidavit and indemnifying agreement which I am enclosing and which I will request that the seller and the personal representatives sign and execute."

In his cover letter to Logan, Heiny expressed concern that Coldwater Farm might be the object of a widow's election. On September 1, 1981 Logan mailed an affidavit to Dorothy Walz. The affidavit declared that she had no interest in Coldwater Farm. Dorothy Walz refused to sign the affidavit, a refusal which has continued to the current time. On August 31, 1981 Roy Walz filed a petition to deliver a personal representative's deed to Mildred Russell as the purchaser of Coldwater Farm. An order was granted for the deed. Both petition and order were filed without notice to all Anton Walz' heirs. Logan later testified that he and the estate's representatives were prepared to deliver an indemnifying agreement to Russell on September 25, 1981. However, no prior approval for such an agreement was obtained from the probate court, it being the appellees' position that no such approval was necessary.

Russell declined to go through with the September 25, 1981 closing and requested the return of her $20,000 earnest money. Her action was based upon her conclusion that the representatives of the estate would not be able to deliver marketable title to Coldwater Farm. Specifically, she was concerned about not having received a quit-claim deed from Dorothy Walz and about defects in the indemnification agreement. The money was not returned. On October 13, 1981 Russell filed a complaint for the return of the money with interest. Trial was held to the court and the following judgment resulted:

"This cause having been previously taken under advisement, judgment is

now entered for the defendants, at plaintiff's cost."

Russell appeals, raising two issues:

1. Does Dorothy Walz' potential claim to Coldwater Farm render the title unmarketable?
2. Are there Indiana inheritance and federal estate tax liens which render the title unmarketable? [1]

## I.

Russell argues that she is entitled to the return of her $20,000 earnest money, with interest, because the Walz children did not have marketable title to Coldwater Farm as of the scheduled closing date, September 25, 1981. Russell argues that "[s]ince the title to the Coldwater Farm [depends] upon facts which are clearly in dispute, and law which is at least unclear, Mildred need not have accepted the title." The merit of this argument depends upon two sub-issues: (1) What is required for a marketable title? and (2) What claim, if any, may Dorothy Walz assert to Coldwater Farm?

The modern rule as to what represents a marketable title was enunciated in *Kenefick v. Schumaker* (1917), 64 Ind.App. 552, 116 N.E. 319. *See also Smith v. Turner* (1875), 50 Ind. 367, 373. In *Kenefick* the court held that to be marketable "a title must be free from reasonable doubt, and such that a reasonably prudent person, with full knowledge of the facts and their legal bearings, willing and anxious to perform his contract, would, in the exercise of

that prudence which business men ordinarily bring to bear upon such transactions, be willing to accept and ought to accept." 64 Ind.App. at 563, 116 N.E. 319. In a later passage the court explicated what it meant by reasonable doubt:

"[A] title *which has no defects of a serious nature, and none of which affect the possessory title of the owner*, ought to be adjudged marketable. In such a title there is no room for reasonable doubt; no question as to peaceable possession; no indication of superior rights; *nothing to suggest adverse claims, or probable litigation*. For these, one and all, would be matters of a serious nature, and in such a title it is expressly declared that defects of such a nature do not exist."

64 Ind.App. at 565, 116 N.E. 319 [second emphasis added].

The *Kenefick* court found that the title forming the basis of the controversy before it was so free of reasonable doubt as to be marketable. The buyers in *Kenefick* had refused to accept title as shown by an abstract prepared at the direction of the sellers. 64 Ind.App. at 556, 116 N.E. 319. The buyers initially refused the abstract because it did not include a "certification as to taxes and special assessments of the corporation of Michigan City, Indiana, or ... the judgment record of the superior court at said city." Two days later, at a date still preceding the scheduled closing date, the sellers re-tendered the abstract,

---

1. The issues in the case were defined by the following pre-trial stipulation:

   "If the Defendants had marketable title to the real estate in accordance with the Agreement to Purchase Real Estate previously entered into between Plaintiff and Defendant, on June 25, 1981, then the Defendants are entitled to retain the $20,000.00 earnest money, and if they did not, the Plaintiff is entitled to a return of the earnest money."

   Insofar as the tax issue is concerned, Norbert Walz testified that neither the federal estate taxes nor the Indiana inheritance taxes had been paid as of September 25, 1981. The estate filed an Indiana Inheritance Tax return on February 16, 1982. On July 19, 1982 the Indiana Department of Revenue filed a petition for redetermination of the inheritance taxes in the An-

ton Walz estate. The federal estate tax return was filed in December, 1981. On April 28, 1982 the Internal Revenue Service issued an Estate Tax Closing Letter indicating acceptance of the return. Russell argues that these taxes represent a lien on the estate: She contends that the Coldwater Farm was appraised at $212,000–$216,000, but that the estate valued it only at $151,000 on both tax returns. She maintains that the Indiana petition to reopen the estate's taxes represents a lien rendering title to the farm unmarketable. She hints that there might be a similar development on the federal level, and she asserts that a "closing letter from the Internal Revenue Service is not a release of any lien for unpaid taxes." Because we reverse based upon Russell's first issue, we do not reach the issue of the estate's tax problems.

with a certification as to both issues. The buyers again refused to accept title, arguing that it contained defects rendering it unmarketable. 64 Ind.App. at 562, 116 N.E. 319. Both the trial and appellate courts disagreed, finding the trivial defects asserted by the buyers insufficient to raise a reasonable doubt as to the security of the title. 64 Ind.App. at 565–66, 116 N.E. 319.

The *Kenefick* test was applied in *Staley v. Stephens* (1980), Ind.App., 404 N.E.2d 633, 635. In *Staley* the buyers contracted for the purchase of a home located in a subdivision. The home was located on a portion of Lot # 10 of the original subdivision. Lot # 10 was subject to a restrictive covenant requiring a ten foot side line set back. Lot # 10 was later divided and its portions made subject to a city side line set back of 8.5 feet. When the property was surveyed for the purchase agreement the survey revealed that a section of the sellers' house was only 8.4 feet from the side line. Therefore, the property was in violation of the city zoning ordinance and the original restrictive covenant. The trial court granted judgment on the evidence for the buyers; an action this court affirmed. 404 N.E.2d at 636. In affirming, we held that "it is generally agreed that a marketable title is one which is free from reasonable doubt and will not expose the party who holds it to the hazards of litigation." 404 N.E.2d at 635. *See also Morris v. Goodwin* (1891), 1 Ind.App. 481, 27 N.E. 985. Based upon the facts presented, we concluded that "it is evidence that although the title defect is small, it is nonetheless a cloud on the title that may expose Buyers to the possibility of litigation due to the remedies available to other landowners in the subdivision. Even though a damage recovery may be nominal, Buyers would still incur the cost of defending against any litigation." 404 N.E.2d at 636. Because this possibility represented a cloud on the title, the title was not marketable and the buyers could not be required to accept it. *Id.* at 635–36, citing *Kenefick* and *Smith v. Turner* (1875), 50 Ind. 367.

■ We turn now to an examination of the potential claims of Dorothy Walz that could affect title to the Coldwater farm. Any claim that Dorothy Walz may have to Coldwater Farm must reasonably be based upon her antenuptial agreement with Anton Walz. That agreement provided that if Anton Walz died while married to Dorothy Walz, she would "receive from the estate of [Anton Walz] one-third (⅓) of the net estate ... *to be in full for all claims and demands of every kind and character*" which she might have against Walz' estate. [emphasis added] Under IC 29–1–3–1 Dorothy Walz, as a second childless spouse, could elect to take against Anton's will, receiving one-third of his personal estate and a life estate in one-third of his real property. This election may, however, "be waived before or after marriage by a written contract, agreement or waiver." IC 29–1–3–6. It has been held that an antenuptial agreement suffices to waive the statutory election. *Estate of Gillilan v. Estate of Gillilan* (1980), Ind.App., 406 N.E.2d 981–989–91; *Baugher v. Barrett* (1957), 128 Ind.App. 233, 241, 145 N.E.2d 297. The Walz' agreement was such a waiver: Dorothy Walz surrendered her statutory election right, among others, in exchange for a one-third share of Anton Walz' net estate. Having waived that right, she may not now assert it. 128 Ind.App. at 241–42, 145 N.E.2d 297; 406 N.E.2d at 989–91. She might, however, assert her rights under the antenuptial agreement.

■ Antenuptial agreements are legal contracts which attempt to regulate the interest which each party to a marriage shall take in the property of the other during the marriage and after its termination by death or other means. *McNutt v. McNutt* (1888), 116 Ind. 545, 551–52, 19 N.E. 115; 41 *Am.Jur.2d* "Husband & Wife" Section 283, Sections 289–91. Antenuptial agreements are favored by the courts as beneficial to public policy and will be liberally construed to effect, insofar as possible, the intention of the parties. *Baugher v. Barrett* (1957), 128 Ind.App. 233, 238–39, 145 N.E.2d 297; *Moore, Adm.*

*v. Harrison, Adm.* (1901), 26 Ind.App. 408, 59 N.E. 1077. *See also* 41 *Am.Jur.2d* "Husband & Wife" Section 288. In determining the intention of the parties, "consideration should be had of the language of the entire instrument, together with its general scope and purpose, the conditions surrounding the parties at the time the agreement was made, the legal rights of the parties as they existed before, and would have existed after the marriage if no agreement had been made.... Each case must be determined upon the basis of the facts in the particular case and the language used in such agreements." *Baugher, supra,* 128 Ind.App. at 239, 145 N.E.2d 297. Although, as a contract, an antenuptial agreement must be based upon consideration, marriage itself is sufficient consideration. *McNutt v. McNutt* (1888), 116 Ind. 545, 550–53, 19 N.E. 115; *Baugher, supra,* 128 Ind.App. at 238, 145 N.E.2d 297. *See also* 41 *Am.Jur.2d* "Husband & Wife" Section 285; IC 29–1–2–13; IC 29–1–3–6. In negotiating an antenuptial contract, however, a man and woman do not stand at arms' length. Because their relation is one "of special trust and confidence toward each other," it demands "the utmost good faith" from both in executing and performing under the agreement. *Kratli v. Booth* (1934), 99 Ind.App. 178, 182, 191 N.E. 180; 41 *Am.Jur.2d* "Husband and Wife" Section 288. Valid antenuptial agreements are enforceable to raise claims or to bar claims waived by the agreement. 2A G. Henry, *The Probate Law and Practice of the State of Indiana* "Distribution" Section 24 (7th ed. by J. Grimes, 1979).

The Walz' agreement gave Dorothy Walz one-third of Anton Walz' net estate if he predeceased her during their marriage. IC 29–1–1–3 defines "net estate" as "the real and personal property of a decedent exclusive of ... allowances and enforceable claims against the estate." Anton Walz originally owned two pieces of real property, his Noble County farm and the Coldwater Farm. For Mildred Russell's argument to prevail, Dorothy Walz must have at least a colorable claim to Coldwater Farm. For Dorothy Walz to have a colorable claim to Coldwater Farm, that farm must have been either a part of Anton Walz' net estate or the object of a fraudulent inter vivos transfer designed to remove the farm from that estate and evade Dorothy Walz' rights under the antenuptial agreement. *Dubin v. Wise* (1976), 41 Ill.App.3d 132, 354 N.E.2d 403.

Before proceeding to those specific questions we must briefly review the law applicable to the deed executed by Walz on September 5, 1980, conveying his remaining interest in Coldwater Farm to his children.

The basic distinction between a deed effecting an inter vivos transfer and a testamentary transfer is the time at which the transferred interest passes. "A will passes no interest until the death of the testator and up to that time it is fully revocable. A deed, on the other hand, passes an interest in the property to the grantee in the grantor's life time, and the latter ordinarily has no privilege of revocation." T. Atkinson, *Handbook of the Law of Wills* 183 (2d ed. 1953). *See Heaston v. Kreig* (1906), 167 Ind. 101, 111–13, 77 N.E. 805; *Matter of Bannon's Estate* (1976), 171 Ind.App. 610, 358 N.E.2d 215; *Stevenson v. Harris* (1954), 124 Ind.App. 358, 118 N.E.2d 368; *Van Orman v. Van Orman* (1942), 112 Ind.App. 394, 402–06, 41 N.E.2d 693. The pivotal question is the grantor's intent. *Stroup v. Stroup* (1894), 140 Ind. 179, 187, 39 N.E. 864. If the grantor intended to confer a present interest in property, the instrument is a deed. If the grantor did not intend to confer a present interest, the instrument is testamentary. *Heaston v. Krieg* (1906), 167 Ind. 101, 111, 77 N.E. 805; *Stroup v. Stroup* (1894), 140 Ind. 179, 187, 39 N.E. 864; *Spencer v. Robbins* (1886), 106 Ind. 580, 5 N.E. 726; *Van Orman v. Van Orman* (1942), 112 Ind.App. 394, 402, 41 N.E.2d 693.

A crucial factor in determining whether a grantor intended to confer a present interest is the extent to which he surrendered control. If it is clear that the grantor intended "to reserve all title, pow-

er of disposition, and management to himself, and to provide for a disposition of the property upon his death," the deed is "what some ... judges have called 'a will in disguise.'" *Stroup v. Stroup, supra; Dickason v. Dickason* (1939), 107 Ind.App. 515, 525–26, 18 N.E.2d 479, *mandate modified* and *rehearing denied* 107 Ind.App. 515, 25 N.E.2d 1014. If, however, the grantor parts with control over the property, the instrument is a deed and effects a valid inter vivos transfer. *Cates v. Cates* (1893), 135 Ind. 272, 34 N.E. 957; *Spencer v. Robbins* (1886), 106 Ind. 580, 5 N.E. 726. The grantor need not, however, surrender all his interest in the property. A deed may effect a valid inter vivos transfer although reserving a life estate in the grantor. Indeed, reservation of a life estate has been held to be strong evidence that a deed was intended, for if the instrument were intended as a will the reservation would be pointless. T. Atkinson, *Handbook of the Law of Wills* (2d ed. 1953), citing *Young v. Payne* (1918), 283 Ill. 649, 119 N.E. 612, 613–14. This proposition has been accepted in Indiana. *See Cates v. Cates* (1893), 135 Ind. 272, 34 N.E. 957; *Kokomo Trust Co. v. Hiller* (1917), 67 Ind.App. 611, 116 N.E. 332; *Timmons v. Timmons* (1911), 49 Ind.App. 21, 96 N.E. 622; *Tansel v. Smith* (1911), 49 Ind.App. 263, 93 N.E. 548, *rehearing denied* 49 Ind.App. 263, 94 N.E. 890. *See also Wilson v. Carrico* (1895), 140 Ind. 533, 40 N.E. 50; *Owen v. Williams* (1887), 114 Ind. 179, 15 N.E. 678; *Stroup v. Stroup, supra; Spencer v. Robbins* (1886), 106 Ind. 580, 5 N.E. 726.

If the warranty deed Anton Walz executed on September 5, 1980 met the above requirements, it was effective as a deed. If it was effective as a deed, it removed Coldwater Farm from Anton Walz' net estate, leaving Dorothy Walz with no claim to the farm under the terms of the antenuptial agreement. If, however, the warranty deed was ineffective as a deed, or if its effectiveness is open to serious dispute, then Dorothy Walz has an assertable claim against Coldwater Farm. If Dorothy Walz has such a claim, then there is a threat of litigation involving the title to Coldwater Farm. Under *Kenefick, supra,* and *Staley, supra,* such a threat is sufficient to render the Walz children's title to Coldwater Farm unmarketable. In addition, even if the deed was an inter vivos conveyance, consideration must be given to Dorothy Walz' ability to challenge its effectiveness as constituting a fraud upon her rights under the antenuptial agreement. *Dubin v. Wise, supra; Kratli v. Booth, supra.*

■ We find that the effectiveness of the warranty deed as a deed is open to reasonable dispute. From our examination of the record we are convinced that questions exist as to whether the September 5, 1980 deed was intended as a deed or as a testamentary transfer. One factor which raises a question as to Walz' intent in executing the September 5, 1980 deed is the sequence of events surrounding that execution: On July 5, 1980 Anton Walz executed a warranty deed divesting himself of his entire remaining interest in Coldwater Farm. That interest was conveyed to his seven children. On July 31, 1980 Anton and Dorothy Walz met with the latter's attorney, Douglas E. Miller. During the course of that meeting Anton remarked that he could live at Coldwater Farm and collect its rents. Miller responded that Anton might do so if his children were benevolent, but that he had no right to do so, having divested himself of ownership of the farm. Miller later testified that Anton was surprised by this observation. Shortly thereafter, on August 8, 12 and 13, four of the children re-deeded their recently-acquired interest in Coldwater Farm back to Anton Walz. As of August 13, therefore, Anton Walz possessed a four-sevenths interest in the portion of the farm remaining after his earlier gifts of fourteen seventy-fifths of the farm were deducted, or approximately 46.5 percent of the total fee. Anton Walz' next action occurred on September 5, 1980 and was the execution of his will and of a warranty deed reassigning this interest to the same four children conditionally, upon the occurrence of either of two eventualities, his death or authorization from his attorney. However, this deed

was not delivered to an independent third party. It was instead left in the hands of Walz' own attorney.

"Where a will and deeds are executed at the same time, it may be requisite to look at all the instruments in order to ascertain the testator's intention, but this alone will not prevent the deeds from passing title to the property described therein, or make them a part of the will." *Wheeler v. Loesch* (1912), 51 Ind.App. 262, 265, 99 N.E. 502; *see also Copeland v. Summers* (1894), 138 Ind. 219, 223–24, 35 N.E. 514, 37 N.E. 971. In *Loesch* Jacob Loesch executed two deeds on the same day he executed his will. The deeds gave to two of Loesch's children tracts of land, one tract for each child. 51 Ind.App. at 263, 99 N.E. 502. The conveyances were in consideration for the children's caring for Loesch until his death and paying the expenses of his last illness and burial. The deeds were delivered to a local bank, with instructions that "this deed shall be delivered by the Cannelton State Bank, who shall hold it until the death of the grantor, to the grantee after the death of the grantor." *Id.* at 264, 99 N.E. 502. In affirming the trial court's decision that the deeds were not part of the will, the Appellate Court found certain facts dispositive: The deeds were executed prior to the execution of the will. The deeds were delivered to the bank to be held until delivery to the grantees— "no provision is made for their recall." *Id.* at 266, 99 N.E. 502. Although the deeds were mentioned in the will, that mention was of an accomplished fact: "I have this day deeded to my son Peter . . . and to my son John" two tracts of land, the deeds to be delivered to Peter and to John upon Loesch's death. *Id.* at 263, 99 N.E. 502. The *Loesch* court found that the deeds were not an aspect of Loesch's will. This finding was based upon the court's determination that Loesch had conveyed an interest in the tracts during his lifetime. That determination was based upon the

deeds' execution prior to execution of the will, and upon language in both documents indicating that transfer of the tracts was a *fait accompli* before the will was executed. *Id.* at 265–66, 99 N.E. 502.

*Loesch* is not, however, clearly controlling in the present case. There are factual dissimilarities in the present case which could reasonably permit it to be distinguished from *Loesch*, with adverse consequences for the efficacy of the September 5, 1980 deed. First, the circumstances surrounding Anton Walz' actions on September 5 are ambiguous. Walz had already executed a warranty deed conveying his interest in Coldwater Farm: On July 5, 1980 he assigned that interest in equal parts to his seven children. The deed was recorded July 9, 1980. It appears that this deed was the product of Walz' conviction that death was imminent. When death failed to become a realized eventuality Walz apparently arranged for a reconveyance: Four of his children deeded their interest in Coldwater Farm back to their father. It is this four-sevenths interest that becomes problematic. To what extent did Anton Walz divest himself of this interest in the September 5, 1980 warranty deed? It is a reasonable inference that he did not intend so complete a divestiture as was effected by the July 5 deed, else why require that this interest be returned to be re-assigned? It is also a reasonable inference that Anton Walz' actions were intended to insure that he retained some measure of control over the farm upon which he intended to reside until his death.

■ This inference of control is supported by other facts in the record.[2] The September 5 deed was deliverable either upon Anton Walz' death or upon written authorization from his attorney. The latter provision suggests that Walz retained the capacity to accelerate delivery by instructing his attorney to deliver the deed before Walz' death. Since the deed was left with

---

2. We note that when a deed exhibits ambiguity as to the grantor's intention, "parol evidence may be received of all facts and circumstances which shed light upon the problem of what was intended." T. Atkinson, *Handbook of the Law of Wills* 185 (2d ed. 1953). *See also Wilson v. Carrico* (1895), 140 Ind. 533, 40 N.E. 50.

his own attorney, the question arises as to whether the deed might have been recalled had Walz so chosen. By contrast Loesch's directive that the bank "shall deliver" the deeds at his death indicates the surrender of control associated with a completed transfer. Predicating delivery upon the occurrence of an uncertain eventuality can render a deed ineffectual as an inter vivos transfer and result in its being construed as a testamentary transfer. Ballantine, *When Are Deeds Testamentary?*, 18 Mich. L.R. 470, 476–80 (1919–20); T. Atkinson *Handbook of the Law of Wills* 184–192 (2d ed. 1953).

Walz' retention of control over the residuary interest in Coldwater Farm is also suggested by language in his will. In the will Anton indicates that he has "vested in my sons Norbert A. Walz, Erwin J. Walz, and Rudy E. Walz all the interest I intend to give them in and to ... Coldwater Farm." This certainly indicates a completed inter vivos transfer. But the will goes on to say "on September 5, 1980, I have deposited with my attorney ... a Warranty Deed covering all of the rest of my right, title and interest in and to ... Coldwater Farm to my other children." The succeeding provision prescribes for delivery upon the eventualities described earlier. The language of the will does not indicate, as did Jacob Loesch's, that a transfer has already been effected of the remaining interest. Rather, the will only indicates that a deed has been prepared and left for later delivery. This ambiguity could be construed as an insufficient relinquishment to effect an inter vivos transfer, a construction supported by one final provision in the will. After discussing Dorothy Walz' interest in the Noble County farm Anton's will declares "but in no event shall any portion of my said Coldwater Farm go to satisfy said obligation," that obligation being Dorothy's rights under the antenuptial agreement. This proviso is, again, an attempt to exert control over Coldwater Farm, an exertion inconsistent with relinquishment of title to the farm. Also, the concern which this provision evinces might be construed as inconsistent with a valid inter vivos dis-

position of Walz' interest in the farm. If his entire interest had already passed to his children, why the necessity for this directive? If Anton's interest had already passed to his children, then that interest was not in his estate and was not available to Dorothy Walz' antenuptial claims. Thus, upon the record there are available inferences that Walz had not divested himself of his interest in Coldwater Farm.

It is in this context that the actions of Dorothy Walz, herself, become highly relevant. She refused upon request to execute a quit-claim deed to Coldwater Farm. She refused to sign an affidavit stating she had no interest in the farm, and she also failed or refused to acknowledge receipt of her full entitlement from the estate. We find these actions coupled with the foregoing facts demonstrate a threat of litigation sufficient to render title to Coldwater Farm unmarketable, at least as of September 25, 1981.

The Walz children argue against this conclusion, asserting that they are entitled to prevail by virtue of the historic "doctrine of relation." The doctrine was incorporated into Indiana law in *Goodsell v. Stinson* (1847), 7 Blackford 437. It described the doctrine as follows:

"The delivery of a deed is an essential requisite to its validity, and it is from the delivery that the deed takes effect. A deed may be delivered to a third person even a stranger, for the benefit of the grantee, and if he afterwards assents to the act, the deed will take effect from the date of its delivery, unless the rights of third persons should be affected by it. In that event the doctrine of relation would not apply, for it is a general rule that it shall not be permitted to apply so as to do wrong to strangers; as between the parties to the deed, it may be adopted for the advancement of justice."

7 Blackford at 439–40.

The doctrine of relation does not dispose of the possibility that Dorothy Walz has an assertable claim against Coldwater Farm. This is true for two reasons.

The first is the exception noted in the above excerpt from *Goodsell:* The doctrine does not apply to bar claims of third parties. Dorothy Walz was not a party to the deed. Furthermore, the doctrine has been held not to apply to affect the claims of creditors. *Owen v. Williams* (1887), 114 Ind. 179, 186, 15 N.E. 678; *Woodbury v. Fisher* (1863), 20 Ind. 387, 389. "An antenuptial agreement has been held to make a wife a creditor of the husband's estate. Whether this is true in Indiana has not been determined." 1B G. Henry, *The Probate Law and Practice of the State of Indiana* 356–57 (7th ed., J. Grimes 1978) (notes omitted). Because there are arguments which can be made that Dorothy Walz is a creditor unaffected by the doctrine of relation, the simple assertion of the doctrine by the Walz children is insufficient to disperse the clouds hovering over the title to Coldwater Farm.

■■■■ A second reason why the doctrine of relation is not sufficient to dispose of Dorothy Walz' claims against Coldwater Farm concerns the effectiveness of delivery of a deed. For the doctrine of relation to apply, the deed must be delivered. *Goodsell v. Stinson* (1847), 7 Blackford 437. Delivery is not effected if the grantor retains "any right to control or record the instrument." *Goodpaster v. Leathers* (1890), 123 Ind. 121, 123, 23 N.E. 1090; *Newman v. Fidler* (1912), 177 Ind. 220, 223, 97 N.E. 785. As we discussed in detail above, the facts in this case reasonably permit the inference that Anton Walz retained control over the warranty deed and over the conveyance it was intended to effect. This inference permits the argument that the deed was never delivered, so that the doctrine of relation does not apply. All of this indicates, at the very least, another litigable issue concerning title to Coldwater Farm.

We have concluded that there are serious doubts as to the efficacy of the September 5, 1980 warranty deed as an inter vivos transfer. We have concluded that these doubts represent a cloud sufficient to render title to Coldwater Farm unmarketable,

at least as of September 25, 1981. Because of these conclusions, we need not discuss the second sub-issue raised earlier in great detail. In the interests of precision, however, we shall comment on it briefly.

The second sub-issue began with the assumption that the warranty deeds of July 5 and September 5, 1980 effected a valid inter vivos transfer of title to Coldwater Farm. The issue then became whether that transfer was voidable as a fraudulent transfer designed to remove property from Anton Walz' net estate and thereby defeat Dorothy Walz' rights under her antenuptial agreement. We make the following observations regarding this issue:

■■■■ "Where the relation of husband and wife exists, the law raises a presumption of trust and confidence." *Kratli v. Booth* (1934), 99 Ind.App. 178, 182, 191 N.E. 180. This presumption extends to property rights. 41 *Am.Jur.2d* "Husband & Wife" Section 314. The presumption can be overcome, however, by evidence that one spouse is attempting to defeat the property rights of the other. *Crawfordsville Trust Co. v. Ramsey* (1913), 55 Ind. App. 40, 73, 100 N.E. 1049; *Garrard v. Garrard* (1870), 7 Bush. (Ky.) 436. The property rights of a wife under an antenuptial agreement may not be fraudulently defeated. 41 *Am.Jur.2d* "Husband & Wife" Sections 298–99, 314; *McNutt v. McNutt* (1888), 116 Ind. 545, 549, 19 N.E. 115. *See also* 14 *Am.Jur.Proof of Facts 2d* 755. *Dubin v. Wise* (1976), 41 Ill. App.3d 132, 354 N.E.2d 403 concerned property transfers allegedly made to defeat a wife's property rights under an antenuptial agreement.

In *Dubin*, the husband promised to leave his wife one-quarter of his estate at his death in return for her surrendering any other claims to his property. 354 N.E.2d at 410. Approximately six months before his death husband transferred the bulk of his assets to his two sons. 354 N.E.2d at 406. The wife's heirs later brought suit against the husband's estate, alleging intentional dissipation of assets designed to defeat the wife's antenuptial rights. The trial court

found for the wife's heirs, and the decision was affirmed on appeal. In its opinion the appellate court held that an antenuptial promisee "may attack real inter vivos donative transfers by the promisor" upon either of two independent grounds:

"(1) fraud in fact based upon the existence of an actual intent thereby to subvert the antenuptial agreement; and (2) fraud implied in law from transfers of a disproportionate and unreasonable amount of assets in relationship to the balance of the promisor's property. In our view, either type of fraud upon the contractual right of the promisee is a breach by the promisor of an implied term of the antenuptial agreement, namely, that the promisor will deal with his or her own property in good faith."

354 N.E.2d at 408–09.

The *Dubin* court premised its affirmance upon a finding of fraud implied in law from disproportionate transfers. The court agreed with the trial court's finding that the husband had breached his duties under the antenuptial agreement by exhausting his estate of assets through inter vivos transfers. 354 N.E.2d at 411. Because the transfers were a fraud on the wife's antenuptial rights, they "were therefore voidable ... to the extent required to enforce her said ... right." *Id.* at 409.

■ Although we do not reach the issue here, we note that the present facts are susceptible to an argument based upon *Dubin:* Shortly before his death Anton Walz endeavored to complete an inter vivos transfer of Coldwater Farm, valued at $212,000. Dorothy Walz has received no share of that farm. Under her antenuptial agreement she received $48,738.00, a one-third share of another farm sold for $147,-000.00. Certainly these facts permit assertion of a *Dubin* argument. Therefore, even in this alternative interpretation of the efficacy of Anton Walz' actions on September 5, 1980 there exists a litigable issue creating a cloud on title to Coldwater Farm in view of Dorothy Walz' refusal to disclaim any interest.

Because of our conclusions regarding the marketability of title to Coldwater Farm, we reverse the trial court's decision and find that Mildred Russell is entitled to the return of her earnest money. In her brief Russell cursorily requests pre-judgment interest on her earnest money. We remand this issue to the trial court for a determination as to Russell's entitlement to pre-judgment interest and for a determination as to the amount of interest, if any.

Reversed and remanded.

HOFFMAN, P.J., and STATON, J., concur.